## ARLINGTON COUNTY SCHOOL BOARD, Plaintiff,

v.

## John SMITH, Jill Smith, parents of Jane Smith, Defendants.

No. CIV.A. 02–465–A.

United States District Court, E.D. Virginia, Alexandria Division.

Nov. 14, 2002.

---

Carol Winfield McCoskrie, Arlinton County Atty's Office, Arlington, VA, for Plaintiff.

Kevin Donal McInroy, John Joseph Rigby, McInroy & Rigby L.L.P., Arlington, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this Individuals with Disabilities Education Act ("IDEA")[1] dispute, the school board appeals the decision of a hearing officer, who determined that the school board had not provided an emotionally disturbed student with a Free and Appropriate Public Education ("FAPE"), as required by IDEA, 20 U.S.C. § 1412(a)(1), and accordingly ordered that the student be placed in a private, therapeutic day school. The matter is now before the Court on cross-motions for summary judgment.

### I.[2]

Jane Smith[3] is a seventeen year-old high school senior with a range of afflictions. She suffers from attention deficit disorder ("ADD"), bipolar disorder, post-traumatic stress disorder, and major depression. Until her transfer to the Fenster School at the start of her junior year, where she is currently enrolled, she attended Arlington County Public Schools ("APS"). Jane first qualified for special education services in APS in 1998, when she was in the seventh grade, and was diagnosed as having ADD and bipolar disorder. During that year, she made suicidal gestures and was hospitalized for psychiatric treatment. Her bipolar disorder caused her to experience cycles of depression, which made it difficult for her to complete school assignments in a timely manner. At that time, her Individualized Education Program ("IEP")[4] called for her to continue attending regular academic classes, but also assigned her a qualified special education monitor.[5] Under this IEP, Jane was academically successful, earning average to above average grades in her classes. As a result, she retained the same IEP for the eighth and ninth grades. Jane's special education monitor in the ninth grade, Ms. Roberta Steinberg, stated that Jane's achievement during this period was "mostly in the superior range." Her grades during the ninth grade year were mostly Bs, and an A and a C.

In Fall of 2000, Jane began the tenth grade at Yorktown High School. On October 11, 2000, her IEP was reviewed. Given her past academic success while receiving no special education services apart from monitoring, the IEP team[6] proposed

---

1. 20 U.S.C. § 1400 et seq.

2. These facts are derived from the administrative record of the due process hearing, including the hearing transcript and admitted exhibits.

3. This is a pseudonym to protect the student's privacy. Similarly, Jane's parents are pseudonymously referred to in the pleadings as Dr. John Smith and Mrs. Jill Smith.

4. Under IDEA, the disabled student's teachers must develop an IEP which contains, inter alia: "(i) a statement of the child's present levels of educational performance...; (ii) a statement of measurable annual goals...; (iv) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class...; (viii) a statement of—(I) how the child's progress toward the annual goals described...will be measured; and (II) how the child's parents will be regularly informed...." 20 U.S.C. § 1414(d)(1)(A). The Fifth Circuit has succinctly described an IEP as "the educational blueprint that specifies how the child is to be taught, sets goals and determines how progress is to be measured." Helms v. McDaniel, 657 F.2d 800, 802 (5th Cir.1981).

5. A special education monitor is a special education teacher assigned to monitor the student's progress under the IEP. She also serves as a liaison with parents, as well as between the student and other staff members.

6. The IEP team, which prepares the IEP, consists of the student's parents, at least one special education teacher or provider, at least one regular education teacher (if applicable), a school district representative, and, when appropriate, the student herself. See 20 U.S.C. § 1414(d)(1)(B).

that Jane continue to attend regular education classes, and, in addition, receive one half hour of special education services per week in the form of an organizational skills class. Jane's guidance counselor stated that she had a "pretty rigorous schedule," which included an Advanced Placement European history course. During this semester, Jane began to experience some signs of emotional difficulties, and had trouble completing her homework. Jane's difficulties were attributed to her mother's hospitalization for heart surgery, as well as to her traumatic experience as the victim of a sexual assault by a fellow student at school. In the aftermath of this experience, Jane was diagnosed as suffering from post-traumatic stress disorder. Despite all this, Jane continued to achieve passing grades in her classes that semester.

Jane's emotional difficulties peaked during her winter vacation, when she began to mutilate herself by cutting her arms and legs, and she also made two serious attempts at suicide. These attempts led to her four-week hospitalization at Dominion Hospital in January 2001. Since Dominion had an educational component, Jane was able to complete some assignments and receive grades that were transferrable to Yorktown. She received all As for participation, and earned favorable reports concerning her work habits and behavior. Dominion's staff also noted that "[i]n general, Jane responded favorably to a highly structured environment and small class size. Her participation and involvement in the educational/therapeutic activities varied daily."

Jane returned to Yorktown on February 7, 2001. That morning, Jane and her mother met with counselors to plan Jane's transition back to school. While Jane was behind in much of her school work, her counselors did not want to overwhelm her with too much after-school extra help be-cause it would make her school day too long. Instead, Jane's counselors determined that she should attend Instructional Studies, which was a structured study hall class during which students do homework or receive extra help from teachers.

Jane's counselors and teachers held a follow-up meeting with Jane's parents on February 16, 2001, to discuss additional ways to help Jane complete her missed school work. Jane's teachers had offered her extra help during lunch time and after school, but Jane did not take advantage of these opportunities. Compounding Jane's already difficult academic transition back to Yorktown were her mounting absences from school, particularly from her morning classes. The Smiths attributed Jane's poor attendance to her medication, which made her sleepy in the morning. They also believed that Jane's absences resulted from her fear of attending the same school where she had been sexually assaulted by a student the previous semester. While that student was expelled, the Smiths believed he was still able to gain access to the school. They were very concerned about Yorktown's ability to monitor closely Jane's attendance, especially in light of Jane's continued self-mutilation and suicidal thoughts.

At the end of the February 16, 2001 meeting, the Smiths were given information about APS's Interlude Program, which is contained within the Yorktown building. APS describes Interlude as an "intensive alternative education program for students whose serious emotional problems and disruptive behaviors interfere with academic achievement and interpersonal relationships." This program includes a therapeutic component; students receive therapy once a week, and have access to additional therapists who work with Interlude full-time. Interlude, APS's only therapeutic program for emotionally

disturbed students, has up to thirty students, with a maximum of ten students in each classroom. A teacher and an assistant are assigned to each classroom. The small class size allows for individualized instruction where students may take any general education class, including Advanced Placement classes. Because the general education classes are individually tailored to each Interlude student, it is possible for Jane to progress faster than the students in the general education setting. Interlude uses the same textbooks that are used in the general education setting. Finally, Interlude monitors student attendance more closely than Yorktown usually does for its general education students. If an Interlude student does not arrive at school, the staff will promptly contact her parents to determine her whereabouts. In appropriate circumstances, the staff will also contact the police officer assigned to Yorktown to locate the student.

As a result of the February 16, 2001 meeting, an IEP meeting was held on February 23, 2001, which resulted in a new IEP. The new IEP called for Jane to remain in the general education setting for her classes, while having access to services in the Interlude program when needed for relief from the general education environment. For example, if she could not cope with going to class, she could go instead to an Interlude classroom rather than simply cutting class or going home. The new IEP also gave Jane an hour per week of Interlude therapy from Dr. Eva Lilienthal, and provided for her to be monitored by an Interlude teacher, Ms. Orpha Durgin. The Interlude staff was available to help coordinate Jane's extra-help sessions during her lunch time and after school to enable her to catch up with her missed school work. In fashioning the new IEP, the team considered and rejected a full-time placement in Interlude because the team members believed that Jane could catch up with her missed homework without such a placement.

Nonetheless, even with this new IEP in place, Jane continued to have emotional difficulties, significant absences from school, and trouble making up school work she missed owing to her hospitalization. She did not attend the scheduled extra-help sessions with her teachers, and her grades continued their downward trend. She ended the fourth marking period with all failing grades, except that she passed two standards of learning exams, one in biology and another in geometry. Her teachers attributed her poor performance not to a lack of academic ability, but to her failure to attend the extra-help sessions, and to her inability to make up her missed school work.

The Smiths, however, believed that the remedy for Jane's problems was more intensive academic help, beyond what was typically provided to a general education student. Moreover, the Smiths believed that it was difficult for Jane to attend the after-school sessions because she was afraid of walking home by herself due to her assault the previous semester; the late bus route did not stop near her home.

Jane also did not utilize the therapeutic services provided by Interlude. Instead, she succeeded in avoiding most of the counseling sessions with Dr. Lilienthal. First, she skipped the Instructional Studies class, which was the time scheduled for her therapy sessions. Dr. Lilienthal then scheduled their meetings for another period, but Jane skipped those meetings as well. When Jane did not appear, Dr. Lilienthal attempted, usually unsuccessfully, to find her in the building. It appears that Dr. Lilienthal never succeeded in having more than three or four therapy sessions with Jane, and those sessions occurred only when Dr. Lilienthal was able to locate her; Jane never went to Dr. Lilienthal's

office on her own. By May, Jane was flatly refusing to attend the therapy sessions with Dr. Lilienthal. She told Dr. Lilienthal about a meeting between herself, her mother, and her private therapist, where they had agreed that she no longer should meet with Dr. Lilienthal. This was a fabrication; there had been no such meeting.

Further compounding Jane's emotional difficulties was her association with other emotionally disturbed students, some of whom were suicidal and depressed. Jane's guidance counselor at Yorktown felt that Jane's association with this group kept her from making progress, both emotionally and academically. The Smiths contend that Jane associated with them because she was still fearful at school, and this group of students, which included a physically-imposing football player, promised to provide her protection.

Despite all this, there were some positive aspects of Jane's spring semester. During her Spring Break, she went on a trip to Greece and Turkey arranged by the history department. This trip consisted of a cruise and many organized, guided tours to historical sites, but the students were also given some time to explore on their own. Jane did not require any special attention on the trip, other than some assistance managing a sprained ankle.

On April 27, 2001, a student study committee [7] was convened to discuss Jane's poor attendance and declining grades. At this time, the Smiths were made aware that Jane's attendance problem was quite severe. The Smiths requested that Yorktown take disciplinary action against Jane when this occurred.

In May and June, Jane's problems worsened. Mrs. Smith called Dr. Lilienthal to inform her that Jane had become increasingly depressed, had suicidal ideation, and was mutilating her arms. Mrs. Smith did not believe Jane could take her final exams. Also at that time, Dr. Lilienthal issued her end-of-the-year psychotherapy progress report which showed that Jane was not successful in her partial placement in the Interlude program, owing to Jane's failure to attend either the extra-help sessions with Interlude staff or the therapy sessions with Dr. Lilienthal.

On June 18, 2001, another student study committee meeting was held at which the Smiths asked that Jane be placed in a more structured environment where she would be more closely supervised. Jane's counselors and teachers proposed changing Jane's IEP to increase significantly her time in the Interlude program. The Smiths, however, wanted Jane to be placed in a private therapeutic program. At a meeting held on July 11, 2001, the IEP team developed a new IEP for Jane, which called for twenty-six hours of services in Interlude per week. Jane would take all of her academic classes, except electives, in Interlude, and also receive one hour of counseling per week. The Smiths did not agree to this new IEP, as they believed that Interlude had already failed Jane, and thus the new IEP, in their view, was not appropriate and would not benefit Jane. Accordingly, the Smiths requested a due process hearing, which took place on August 1, 2001.

At the hearing, APS, by counsel, presented various exhibits and the testimony of six witnesses: Mr. Michael Krulfeld, Jane's counselor at Yorktown; Mr. Mi-

---

**7.** A student study committee meeting is convened at the suggestion of the student's parent or teacher when the student is not making progress under her current IEP. Such meetings can serve as a precursor for a formal IEP meeting. In committee meetings, participants discuss alternative courses of action that might benefit the student, but it is not an official IEP meeting during which official changes to the student's IEP may be made.

chael Palermo, Jane's Advanced Placement European history teacher; Ms. Orpha Durgin, an Interlude English teacher and Jane's special education monitor in the tenth grade; Ms. Roberta Steinberg, an English teacher and Jane's special education monitor in the ninth grade; Dr. Eva Lilienthal, a therapist in the Interlude program; and, Ms. Kathy Veldran, a special education coordinator at APS. The Smiths, who appeared *pro se*, offered their own testimony, and the testimony of Ms. Eleanor Light, a social worker at Yorktown.

At the conclusion of the hearing, the hearing officer ruled that the Interlude placement was not "reasonably calculated to enable [Jane] to receive educational benefit." The hearing officer based this conclusion on several factual findings. First, he found that Jane had a strong desire not to participate in Interlude, and was "intelligent enough to manipulate her situation and sabotage any attempt to place her in the program." Second, the hearing officer concluded that because of Jane's part-time placement in Interlude, she had already met and worked with its staff, and she had "failed both academically and therapeutically" with this staff. While acknowledging that many Interlude features made the program appear appropriate for Jane, namely its small class size, highly structured program, and greater monitoring of attendance, the hearing officer nonetheless found that these beneficial features were "unlikely to overcome [Jane's] fears and self-esteem problems associated with mixing in a public school environment," in which special education students were a small percentage of the student population. This, coupled with the failure of Interlude's therapeutic component to address Jane's emotional needs, led the hearing officer to conclude that Interlude was not an appropriate placement for Jane.

Significantly, however, the hearing officer did not grant the Smiths' request for a private, residential school, noting there was no evidence to suggest that Jane required a residential placement to receive educational benefit. Instead, the hearing officer concluded that a proper placement for Jane required the following features: (i) a highly structured program, including closely monitored, small classes; and, (ii) a program that specializes in educating emotionally disturbed children, and provides therapeutic services, as well as a wide range of outside activities. Thus, the hearing officer concluded that the appropriate placement for Jane was a private, therapeutic day school, and he suggested certain schools.

The events that followed are in dispute.[8] The Smiths contend that they were willing to abide by the hearing officer's decision, and made repeated attempts to contact Jane's IEP team in an effort to hold an IEP meeting and arrange for her placement in a private, therapeutic day school. APS, by contrast, claims that the Smiths never agreed to the hearing officer's placement of Jane in a private day school. APS also disputes the Smiths' contention that they made repeated attempts to contact Jane's IEP team. By August 27, 2001, APS had made no arrangements for Jane to attend a private day school. With the school year about to begin, the Smiths unilaterally decided to place Jane at the Fenster school, a private, residential school in Arizona. On August 31, 2001, APS informed the Smiths that it intended to appeal the hearing officer's decision, and offered Jane a "stay put" placement,[9] under which Jane would remain in the placement specified in the February 23,

---

8. These disputes, in the end, are not material to the issue presented.

9. A "stay put" placement is the student's placement contained in her most recently agreed-upon IEP. *See* 80 VAC 20–80–76.E.1.

2001 IEP, the last effective IEP. Once APS discovered that Jane had enrolled at the Fenster school, which occurred when an APS staff member contacted that school directly, APS withdrew Jane from its school system, believing that her parents intended to fund that placement themselves.

For their part, the Smiths claim they received no word from APS regarding implementation of the hearing officer's decision. As a result, on December 21, 2001, they filed a complaint letter with the Virginia Department of Education ("VDOE") regarding APS's failure to place Jane in a private, therapeutic day school.[10] On March 28, 2002, the VDOE issued a Letter of Findings, stating that APS had violated Virginia law by failing to implement the hearing officer's decision while it was being appealed.[11] Four days later, on April 1, 2002, APS filed this action seeking review of the hearing officer's decision.

During the summer of 2001, Jane held three jobs, including two babysitting jobs. For the 2001–2002 school year, Jane was enrolled at the Fenster school in Arizona, where she made significant improvement, both emotionally and academically. According to her headmaster, her self-esteem has improved and she is increasingly self-motivated. She is also doing well academically, making the honor roll in January 2002 and receiving a faculty award given to students who have made significant progress during the year. She was reportedly eager to return to Fenster for her senior year of high school, and presumedly has done so.

## II.

The IDEA, enacted in 1990, requires school districts to provide disabled students with a FAPE as a condition of receiving federal funding. See 20 U.S.C. § 1412(a)(1). A school district ensures that a disabled student is receiving a FAPE by providing the student with an IEP. See 20 U.S.C. 1414(d). Where, as here, the adequacy of an IEP is in issue, the Supreme Court has mandated that a reviewing court conduct a two-prong inquiry to determine whether a student's IEP fulfills the school district's obligation to provide a FAPE. Under the first prong, not at issue here, the reviewing court must determine whether the state has complied with IDEA's procedural requirements. See *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690(1982).[12] Under the

---

10. This complaint letter was filed pursuant to 8 VAC 20–80–76.O.6, which provides that "[i]f the hearing officer's decision is not implemented as required by this chapter, a complaint may be filed with the Virginia Department of Education for an investigation through the state's complaint system."

11. In the event a hearing officer's decision is appealed, pursuant to 8 VAC 20–80–76.O.3, "implementation of the hearing officer's order is held in abeyance, *except in those cases where the hearing officer has agreed with the child's…parents that a change in placement is appropriate.*" (emphasis added). In this case, the hearing officer agreed with the Smiths that a change in placement was appropriate; in fact, all parties agreed that Jane's then-existing IEP was not appropriate

for her. But it is not correct that Jane's parents and the hearing officer were wholly in agreement as to what the new placement should be; the hearing officer specified a private, therapeutic day school, while the parents opted for placing Jane in a private, specialized boarding school. In any event, the VDOE determined that the hearing officer's decision should have been implemented pending APS's appeal, and this determination was upheld on May 22, 2002, by a Complaint Appeal Reviewer, a private lawyer designated to perform such reviews. Whether the VDOE determination in this respect was correct need not be addressed given the result reached here.

12. During the due process hearing, the Smiths argued that APS's failure to notify

second prong, which is the relevant inquiry here, the reviewing court must determine whether the IEP is "reasonably calculated to confer some educational benefit on a disabled child." *Id.* In that regard, the Supreme Court has defined a FAPE as providing disabled children with a "basic floor of educational opportunity, ... [which] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley,* 458 U.S. at 200–01, 102 S.Ct. 3034. Yet, it is important to note that the IDEA does not require a school district to provide a child with the best possible education. *See MM· v. School District of Greenville County,* 303 F.3d 523, 526 (4th Cir.2002) (citing *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034). Instead, a school district can satisfy its obligation to provide a disabled child with a FAPE by providing "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Rowley,* 458 U.S. at 203, 102 S.Ct. 3034.[13]

■ The IDEA and Virginia law provide parents who are dissatisfied with the school district's IEP decisions with a *de novo* due process hearing conducted by an independent hearing officer, not employed by that school district. *See* 29 U.S.C. § 1415(f); Va.Code 22.1–214(B)–(D); 8 VAC 20–80–76.O. The law also allows the parties to seek additional review in a federal district court or the Virginia circuit court where the school district is located. 29 U.S.C. §§ 1415(i)(2)-(3)(A); Va.Code § 22.1–214(D). When this occurs, the reviewing court must (i) conduct a modified *de novo* review; (ii) make an independent decision based on a preponderance of the evidence; and, (iii) grant appropriate relief if warranted. *See MM,* 303 F.3d at 530–31; 20 U.S.C. § 1415(i)(2)(B)(iii); Va.Code § 22.1–214(D); 8 VAC 20–80–76.O.2. At the same time, reviewing courts must give "due weight" to the underlying administrative proceedings. *Doyle v. Arlington County School Board,* 953 F.2d 100, 103 (4th Cir.1991) (citing *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034).

■ The Fourth Circuit's *Doyle* decision is particularly instructive on the meaning of according "due weight" to the administrative hearing. Central to a reviewing court's analysis in this regard must be an examination of the methods the hearing officer employed to reach his decision. *See Doyle,* 953 F.2d at 105. When the hearing officer's factual-findings are "regularly made and entitled to *prima facie* correctness, the district court, if it is not going to follow them, is required to explain why it does not." *Id.* However, when the hearing officer has "departed from the fact-finding norm to such an extent... [that] the facts so found as a result of that departure are entitled to no weight." *Id.* The Fourth Circuit has also warned that the reviewing court is not to "substitute [its] own notions of sound educational policy for those of local school

---

them of Jane's many unexcused absences from class constituted a procedural violation because APS did not follow its established policy of informing parents of their child's absences. The hearing officer properly rejected this argument, holding that the allegations, even if true, did not amount to an IDEA procedural violation. *See* 20 U.S.C. § 1415 *et seq.* (setting forth the procedural safeguards afforded to parents when their child is in special education).

**13.** It is worth noting that at least one state— Massachusetts, as the IDEA permits, has enacted a more stringent standard. Specifically, children in Massachusetts who are eligible for special education services are entitled to IEPs that provide for their *"maximum possible development." See* Mass. Gen. Laws Ann. ch. 71B § 2 (emphasis added); *Frank S. v. School Committee of the Dennis–Yarmouth Regional School District,* 26 F.Supp.2d 219, 226 (D.Mass.1998).

authorities," nor should the reviewing court "disturb an IEP simply because [it] disagrees with its content." *MM*, 303 F.3d at 531–32 (quoting *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 999 (4th Cir.1997) and *Tice v. Botetourt County School Board*, 908 F.2d 1200, 1207 (4th Cir.1990)). Indeed, once a "procedurally proper IEP has been formulated, a reviewing court should be reluctant . . . to second-guess the judgment of education professionals." *Tice*, 908 F.2d at 1207. Instead, the court should "defer to educators' decisions as long as an IEP provided the child the basic floor of opportunity that access to special education and related services provides." *Id.*

When this case record is viewed through the lens of these well-established legal principles, they compel the conclusion that the hearing officer's decision was erroneous. Specifically, the hearing officer's findings lack support in the record, and he failed to defer to the considered judgment of the educational experts, who uniformly and consistently testified that Jane would receive educational benefit from her placement in the Interlude program.[14] First, Ms. Durgin, an English teacher in Interlude and Jane's special education monitor during her part-time placement in that program, testified that placing Jane in Interlude for all of her academic classes would curtail her ability to skip classes and "hang out," and help prevent Jane from falling further behind in her classes. Ms. Durgin reasoned that the small size of Interlude, and the close contact the Interlude teachers have with one another, would enable the staff to monitor Jane and her progress very closely. Next, Ms. Veldran,

a special education coordinator at APS, also echoed these views, testifying that Interlude's small classes and structured environment would allow Jane to be more closely supervised, and concluded that the proposed IEP would allow Jane to make educational progress. She also explained that Jane's increased hours in Interlude meant that "the majority of her day would be spent with specialists who could address [her] emotional concerns as they came up." Finally, Dr. Lilienthal, Jane's Interlude therapist, also testified that Jane would benefit from the individualized attention and more careful monitoring of attendance that students receive in Interlude. Significantly, the Smiths presented no testimony that Interlude was an inappropriate placement for Jane.

Moreover, an analysis of the hearing officer's fact-finding methodology, as mandated by *Doyle*, reveals that none of the key factual findings relied upon by the hearing officer to reach his conclusion is supported by evidence in the record. *See Doyle*, 953 F.2d at 105. Accordingly, these factual findings are entitled to "no weight." *Id.* First, the hearing officer concluded that Jane would not be successful in Interlude "because she has a strong desire not to be in the program." Yet, there was no evidence that this "strong desire" would be determinative of Jane's success in the program. Indeed, the hearing officer asked Ms. Veldran, a special education coordinator, whether Jane could be successful in Interlude if she did not want to be there. Ms. Veldran responded that "[m]any students don't want to go [to Interlude] . . . . [i]t is the role of the team to work through that." Thus, the record re-

**14.** *See Springer v. Fairfax County School Board*, 134 F.3d 659, 663 (4th Cir.1998) (holding that "[a]bsent some statutory infraction, the task of education belongs to the educators who have been charged by society with that critical task") (citing *Hartmann v. Loudoun County*, 118 F.3d 996, 1000 (4th Cir.1997)); *Board of Education of Montgomery County v. Brett Y.*, 155 F.3d 557, 1998 WL 390553, *13–14 (4th Cir.1998) (Table) (emphasizing the value of consistent witness testimony at due process hearings).

flects that many students assigned to Interlude begin the program in Jane's frame of mind—a "strong desire" not to be in Interlude, but then, with the aid of Interlude staff, overcome this aversion over time. Yet the hearing officer apparently ignored this evidence, choosing instead to accord decisive weight to Jane's desires. The effect of the hearing officer's failure to acknowledge this evidence is to allow the student to dictate the placement, a strategy that is unlikely to lead to an educationally appropriate result.

Also unsupported by record evidence is the hearing officer's conclusion that Jane would not succeed in Interlude because "she has already met and dealt with the personnel and failed both academically and therapeutically." It was, at least, premature for the hearing officer to conclude that Jane had "failed academically" in Interlude. While Jane did have an Interlude staff member as her special education monitor, this was the only aspect of Interlude's academic program in which Jane had participated prior to the hearing. At that time, she was still taking classes in the general education setting, and the additional help she was offered also took place in that setting. The fact is Jane had never participated in the complete Interlude experience; she had not interacted with Interlude teachers in the Interlude classroom setting, which is completely different from the general education setting she was experiencing. There was, therefore, no record basis for the hearing officer's conclusion that Jane had "failed academically" in Interlude.

The record similarly does not support the hearing officer's conclusion that Jane's experience with Dr. Lilienthal meant she would not benefit from Interlude therapy. Dr. Lilienthal's end-of-the-year psychotherapy progress report noted that she found it difficult to establish a therapeutic relationship with Jane because Jane con-

sistently failed to appear for the sessions. In the Interlude program, Jane would presumedly not have this option. Several teachers and specialists, including Ms. Durgin, testified that Jane would be more closely monitored in Interlude, which would curtail Jane's ability to leave class and skip her sessions with Dr. Lilienthal. The hearing officer's conclusion that Interlude would not benefit Jane also flies in the face of the uncontroverted evidence that Interlude's specialized staff, including Dr. Lilienthal, would provide Jane with far more therapeutic support for her emotional problems than she received under her prior IEP. As Ms. Veldran testified,

> These [Interlude] teachers know how to deal with [emotional problems] right away. The therapist is right there...if there is a crisis....If a student comes in not ready to learn, they deal with it right away, [and] get them to a place where they are ready to learn....That can't happen in a general ed setting.

Also unsupported by evidence in the record is the hearing officer's conclusion that Jane could never be successful in Interlude because she would be too self-conscious about being different from the students in the general education population. The hearing officer relied on this factual finding to reach the conclusion that Interlude's many benefits (small class size, structured academic setting, and specialized therapeutic component) could not be outweighed by Jane's "self esteem problems associated with mixing in the public school environment [that] includes a vast body of regular education students and a small body of special education students." Yet, this is simply the hearing officer's opinion, for there was no expert psychological testimony attesting to Jane's emotional needs in that regard; only Dr. Smith, who is not such an expert, testified to Jane's need for an educational environment where all the students were "in the same boat." Addi-

tionally, even assuming that Dr. Smith was correct in this respect, Interlude meets this criterion; it is a program that specializes in emotionally disturbed students. In Interlude classrooms, Jane would be among similarly-disabled students. Accordingly, this factual finding and conclusion is erroneous.

In summary, the preponderance of the record evidence points persuasively to the conclusion that APS's proposed placement of Jane in the Interlude program would provide her with a FAPE because it was "reasonably calculated to enable [her] to receive educational benefit." *See Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034. The hearing officer's contrary conclusion that Jane would not benefit from the Interlude program finds no support in the record, as no expert testified to this effect, and Jane had not yet fully experienced the program. It is apparent that the hearing officer succumbed to the temptation, which exists for judges and hearing officers alike in IDEA cases, to make his own independent judgment as to the best placement for Jane, instead of relying on the record evidence presented in the hearing. This temptation stems from the fact that judges and hearing officers are typically parents who are in the habit of making such judgments. Yet, the Supreme Court and Fourth Circuit have admonished hearing officers and reviewing courts alike when they substitute personal opinions or judgments as to proper educational policy, and best placements for the disabled student, in the place of the local educators' expert judgments. *See Rowley,* 458 U.S. at 206, 102 S.Ct. 3034; *Hartmann,* 118 F.3d at 1000–

01. These courts have also reminded hearing officers and reviewing courts that school districts are not required to provide a disabled child with the best possible education. *See Rowley,* 458 U.S. at 192, 102 S.Ct. 3034. The result reached here is properly deferential to Jane's educators' unanimous determination that the Interlude placement was appropriate. *See Hartmann,* 118 F.3d at 1001 (holding that "local educators deserve latitude in determining the [IEP] most appropriate for a disabled child").[15]

Finally, the hearing officer's conclusion that Jane required placement in a private, day facility is similarly unsupported by the record. Not only was it the unanimous expert opinion of all the APS witnesses that Jane be placed in Interlude, but the Smiths themselves called no expert witnesses to testify that Jane needed to be in a private, day facility. Thus, because the hearing officer did not provide a "well-reasoned explanation" for his placement decision, his conclusion is entitled to "no weight." *See Brett Y.,* 155 F.3d 557, 1998 WL 390553 at \*12 (citing *Doyle,* 953 F.2d at 105). Accordingly, the hearing officer's conclusion that Jane would not benefit from the Interlude experience, but instead should be placed in a private, therapeutic day facility, must be reversed.

### III.

For these reasons, plaintiff's motion for summary judgment must be granted, and defendants' cross-motion for summary

---

**15.** This is not to say that the hearing officer is wrong in his opinion that Jane would benefit more or even most from placement in a private, therapeutic day school. She might well do so. Indeed, Jane's parents, in the exercise of their sovereign, parental judgment, ultimately elected to place Jane in a private, Arizona boarding school, a decision vindicat-ed by the fact that, happily, Jane is apparently succeeding and thriving there. There might well be many other placements where this result would obtain. But the point is that, on this record, an Interlude placement would have provided Jane with a FAPE, and that is all the law requires.

judgment must be denied. An appropriate order will issue.