PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

A.B., a minor, by his parent and
next friend, D.B.; D.B.,
                  *Plaintiffs-Appellees,*

v.

KENNETH P. LAWSON, (officially as)
Superintendent, Anne Arundel
County Public Schools; BOARD OF
EDUCATION OF ANNE ARUNDEL
COUNTY,

                  *Defendants-Appellants.*

No. 03-1046

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
James K. Bredar, Magistrate Judge.
(CA-02-79-WMN)

Argued: September 24, 2003

Decided: January 6, 2004

Before WILKINSON and GREGORY, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Reversed and remanded by published opinion. Judge Gregory wrote
the opinion, in which Judge Wilkinson and Senior Judge Hamilton
joined.

## COUNSEL

**ARGUED:** Eric Charles Brousaides, REESE & CARNEY, L.L.P.,
Columbia, Maryland, for Appellants. Michael Jeffrey Eig, MICHAEL

J. EIG & ASSOCIATES, P.C., Chevy Chase, Maryland, for Appellees. **ON BRIEF:** Haylie M. Iseman, MICHAEL J. EIG & ASSOCIATES, P.C., Chevy Chase, Maryland, for Appellees.

---

## OPINION

GREGORY, Circuit Judge:

Kenneth Lawson, in his capacity as Superintendent of the Anne Arundel County Public Schools ("AACPS"), and the Board of Education of Anne Arundel County appeal from a judgment of the United States District Court for the District of Maryland (Bredar, M.J.), entered under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, ordering payment of reimbursement to the parent of a learning disabled child for two years' tuition at a private school. The district court concluded that such reimbursement was necessary because AACPS denied AB a free appropriate public education ("FAPE").

AACPS and the student's mother, DB, had engaged in a protracted dispute as to the nature and extent of AB's learning disability. An administrative law judge held that AACPS formulated an Individualized Education Program ("IEP") for the 2000-2001 and 2001-2002 school years that was reasonably calculated to provide AB with a FAPE under IDEA. The district court reversed the ALJ's ruling and granted summary judgment for the Bs. The lower court held that AB had not been provided a FAPE, and AACPS was obligated to reimburse DB for two years of private school education. Because, as explained below, AACPS complied with IDEA and formulated an IEP reasonably calculated to provide AB with some educational benefit, we reverse the district court and direct that summary judgment be entered for Appellants. We also vacate the district court's order insofar as it ordered AACPS to reimburse plaintiffs for AB's placement at the Summit School for the 2000-2001 and 2001-2002 school years.

I.

A.

This case involves the application of IDEA, a statute designed to provide free appropriate educational services to millions of children with learning disabilities in the United States. 20 U.S.C.A. § 1400. One of Congress' primary purposes in enacting IDEA in 1990 was "to ensure that all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs . . . ." 20 U.S.C. § 1400(d)(1)(A); *see also MM ex rel. DM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 526 (4th Cir. 2002).[1] To receive federal funding under IDEA, the state must provide all children with disabilities a FAPE. 20 U.S.C. §§ 1400(c), 1412(a)(1). A FAPE requires the school district to provide instruction that suits the child's needs as well as related services to ensure that the child receives some educational benefit from instruction. 20 U.S.C. § 1401(8); *see also* Md. Code Ann., Educ. § 8-402(a)(3) (defining FAPE); 20 U.S.C. § 1401(22) (defining related services).

Under the act, the state must provide children with "meaningful access" to public education. *Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192 (1982). The FAPE must only be "calculated to confer *some* educational benefit on a disabled child." *MM*, 303 F.3d at 526 (citing *Rowley*, 458 U.S. at 207) (emphasis added). The Supreme Court has held that under IDEA Congress intended to provide a satisfactory level of educational opportunity, not the best education that money could buy. *See Rowley*, 458 U.S. at 189. The Court noted that "[w]hatever Congress meant by an 'appropriate' education, it is clear that it did not mean a potential-maximizing education." *Id.* at 197 n.21; *see also Hartmann v. Loudoun County Bd. of Ed.*, 118 F.3d 996, 1001 (4th Cir. 1997) ("States must . . . confer some educational benefit upon the handicapped child,

---

[1]IDEA is the successor to the Education of the Handicapped Act of 1970, which was amended in 1975 and renamed the Education of All Handicapped Children Act. For the ease of reference, we refer only to "IDEA," even when discussing cases interpreting the statute prior to the 1990 amendments.

but the Act does not require the furnishing of every special service necessary to maximize each handicapped child's potential.") (internal citations and quotation marks omitted).

In addition to IDEA's requirement that the state provide each student with some educational benefit, the student must be placed in the least restrictive environment to achieve the FAPE. The disabled child is to participate in the same activities as non-disabled children to the "maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.550 ("That special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes cannot be achieved satisfactorily."); Md. Regs. Code tit. 13A § 05.01.10 (regulations concerning least restrictive environments). We stated in *DeVries v. Fairfax County Sch. Bd.*, 882 F.2d 876, 878 (4th Cir. 1989), "mainstreaming of handicapped children into regular school programs . . . is not only a laudable goal but is also a requirement of the Act."

To assure that students with disabilities receive FAPEs, IDEA requires that school districts provide IEPs for each disabled child. 20 U.S.C. § 1414(d). Before providing special education, the school district must conduct an individual evaluation to determine a student's eligibility under IDEA. *Id.* § 1414(a)(1)(a); 34 C.F.R. § 300.531. Upon a determination that a student is learning disabled and thus eligible for special education services, the school district is to develop an IEP through cooperation between parents and school officials. 20 U.S.C. § 1414(a)(5). The IEP is to be formulated by an IEP Team consisting of the child's parents, one of the student's regular teachers, a special education teacher, a representative of the school board, an individual who can interpret evaluation results and, whenever appropriate, the disabled child. *Id.* § 1414(d)(1)(B). An IEP must detail the student's current educational status, set forth annual goals for the student's education and state the special educational services and other aids that will be provided to the child as well as the extent to which the child will be mainstreamed. *Id.* § 1414(d)(1)(A).

IDEA also establishes a series of procedural safeguards "designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportu-

nity to object to those decisions." *MM*, 303 F.3d at 527 (internal quotation marks and citation omitted); *see also* 20 U.S.C. § 1415 (procedural safeguards). If the parents are not satisfied with the IEP, they may "present complaints with respect to any matter related to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such a child." *Id.* § 1415(b)(6). After such a complaint has been received, the parents also are entitled to request a due process hearing conducted by the state or local educational agency. *Id.* § 1415(f). Under Maryland law, the Maryland Office of Administrative Hearings conducts the due process hearing. Md. Code Ann., Educ. § 8-413; Md. Regs. Code tit. 13A § 05.01.15. Any party can then appeal the administrative ruling to federal or state court. Md. Code Ann., Educ. § 8-413(h).

When a state receiving IDEA funding fails to provide a FAPE, the child's parent may remove the child to a private school and then seek tuition reimbursement from the state. *Sch. Comm. of Burlington v. Dep't of Ed.*, 471 U.S. 359, 369-70 (1985). The parent may recover if (1) the proposed IEP was inadequate to offer the child a FAPE and (2) the private education services obtained by the parents were appropriate to the child's needs. *Id.* at 370.

### B.

AB is a student that all parties now agree is learning disabled in the areas of writing and reading, thus he is considered disabled under IDEA. The dispute between AACPS and DB arose because AB was not initially coded as learning disabled, and once coded, DB and her experts disagreed with the IEPs proposed by AACPS.

AB was born in 1990. He attended kindergarten through third grade at Annapolis Area Christian School ("Annapolis Christian") during the school years from 1995-1999. During 1997-1998, because of AB's difficulties with reading, DB brought her son to AACPS for educational and psychological testing.The AACPS test results showed various IQ scores between 93 and 113, and its report noted that AB's full scale IQ placed him in the 58th percentile and that he was in the average range of intellectual ability. On educational tests, AB scored below average for his grade in writing and word recognition, but he scored above his grade level in mathematics. AACPS concluded that

the student should be able to "perform academically at a level consistent with same-aged peers." (J.A. 749.)

During the spring of 1998, Annapolis Christian administered multiple achievement tests, finding that while AB was at an advanced level in arithmetic, he had difficulties in written language and reading. The following spring, Annapolis Christian conducted more tests, and AB scored in the average range in reading but scored below his grade level in spelling. His arithmetic performance continued to be above his grade level. At the administrative hearing, DB testified that her son was frustrated at Annapolis Christian and he was "shutting down" and "withdrawing" at the end of the third grade. At the end of the 1998-1999 school year, Annapolis Christian recommended that AB repeat the third grade.

In July 1999, DB had AB evaluated by the Kennedy Krieger Institute ("KKI"). KKI tests results revealed AB's Verbal IQ (WISC-III) was in the high average range, Performance IQ in the superior range, and Full Scale IQ in the high average range. (J.A. 607.) By other testing indicia, however, KKI found that AB's "reading and writing skills [were] poor enough to qualify him as learning disabled." (J.A. 611.)

Though Annapolis Christian recommended that AB repeat third grade, DB withdrew her son from that school and enrolled him in the fourth grade in AACPS at Millersville Elementary School for the 1999-2000 school year. Before the school year started, DB requested that AACPS identify AB's education needs and determine whether he had a disability that would qualify him for special education. AACPS held an IEP meeting on September 27, 1999. Based on the information presented at the meeting, AACPS recommended that AB receive further evaluations to be completed by November 22, 1999.

On October 5, 1999, AACPS's school psychologist Sabbino Strippoli ("Strippoli") administered the Oral and Written Language Scales (OWLS) to AB, and he found all of AB's scores were within the average range. On October 18, 1999, the IEP Team held another meeting and determined that AB did not have a learning disability. On October 22, 1999, DB requested a due process hearing on AB's eligibility for special education services. That hearing was scheduled for December 2, 1999.

On November 8, 1999, the IEP Team held another meeting and concluded that the student did not have a special education disability. At the meeting, the IEP Team concluded that AB was making solid progress in school, noting satisfactory grades and favorable comments by AB's classroom teacher. DB, however, contended that AB would be "'better off' if he [was] identified as having a learning disability," because she asserted her son was performing at a level below his potential as evidenced by his high KKI ability scores. DB further cited the KKI report as determinative evidence of a learning disability. (J.A. 631.)

On November 23, 1999, DB's counsel requested that the due process hearing be postponed so she could obtain an independent evaluation for AB. On November 29, 1999, AACPS opposed the request for postponement. On the same day, DB's attorney withdrew AB's petition for a due process hearing.

On January 5 and 10, 2000, Dr. Sue Antell conducted the independent evaluation. Dr. Antell concluded that AB was "a child of superior intellectual abilities with problems in complex language formulation giving rise to a Disorder of Written Expression, Reading Disabilities with problems in both vocabulary and comprehension." (J.A. 702.) After AACPS belatedly received AB's scores on the tests conducted by Dr. Antell, AACPS offered to hold an IEP meeting on March 10 or March 17, 2000. DB found those dates inconvenient, thus the meeting was delayed.[2]

On March 22, 2000, the IEP Team reconvened and identified AB as having a "special education disability." (J.A. 632.) The Team stated, however, that they had:

> some reservations regarding an adverse impact on this student's educational performance to the extent that special education services are warranted. This student is displaying

---

[2]During this period, on February 24, 2000, DB took AB to meet with a Summit School, a specialty school for gifted and talented children with learning disabilities. The school administered tests on which AB's reading and spelling scores were below his grade average, but his arithmetic score was above average for his grade.

satisfactory achievement based on the report card, work samples and classroom performance. [DB's] representatives do not agree that there is a lack of impact on his educational performance and believe that he needs intensive educational services.[3]

(J.A. 632.) On April 7, 2000, Strippoli prepared a report regarding the IEP Team's interpretation of the various assessment results. An IEP meeting originally scheduled for April 14, 2000 was again delayed to accommodate DB's expert Dr. Antell. At the rescheduled May 3 meeting, the Team presented the draft IEP, and the parties agreed to reconvene on May 30, 2000 to give DB time to review the draft. The draft IEP found AB had a disability limited to the area of written expression. (J.A. 16, 25, 48.)

On May 15, 2000, Dr. Antell sent AACPS's counsel a letter stating that the proposed IEP was unacceptable. She concluded that a main-stream public school education would not provide AB proper flexibility, but also that "[AB]'s superior intelligence render [sic] it inappropriate to place him in a public school's 'special class' for children with far more severe and persuasive disabilities. Again, the *only available option* appears to be placement in a specialized private school for intelligent children with significant learning disabilities, such as Summit School." (J.A. 709 (emphasis added).) At the May 30

---

[3]Indeed, AB's report card for the 1999-2000 school year evidences that he earned primarily A's, B's and C's (he earned a single D in "communicat[ing] mathematical concepts and ideas" for one of four marking periods). (J.A. 688.) He received "satisfactory" and "very good" marks for all of his classes. (J.A. 688.) His reading level, however, was found to be below average during each of the four marking periods. (J.A. 688.) His teacher noted that "[AB] is a pleasure to have in class. He is quick to participate in group discussion," and further added that he was a "delight" who "comes to class prepared and participates regularly." She pointed out at various points, that he had difficulty with spelling, and during the third marking period when he received the D that he had difficulty communicating math concepts. (J.A. 689-90.) During the final marking period, however, she stated "[n]ice improvement in math, [AB]" as the communication mark was a C and the rest of his math grades were B's. AB was also promoted to the fifth grade at the end of the year. (J.A. 688.)

IEP meeting, at DB's insistence supported by Dr. Antell and the KKI evaluation, the IEP Team agreed to further consider whether AB was also learning disabled in reading. DB, however, denied AACPS's request to conduct testing on an expedited basis because she contended the assessments already provided a basis for the diagnosis.

On June 6, 2000, DB filed another request for a due process hearing, arguing that AB should be coded learning disabled in reading. After AACPS moved to dismiss the hearing request as premature, DB's counsel withdrew her request for a hearing on July 27, 2000. On or around July 31, 2000, DB granted consent to conduct additional testing.

On August 12, 2000, AACPS administered the Lindamood Auditory Conceptualization (LAC) test to AB. The test showed that AB could read and spell at approximately the third grade level and his "phonemic ability" was not fully developed. On August 15, 2000, DB notified AACPS that she would be placing AB in the Summit School for the 2000-2001 school year at AACPS's expense. On August 23, 2000, AACPS administered the Wechsler Individual Achievement Test to AB. That test found reading difficulties; AB scored approximately two years below his grade level on each of the tests.

AB enrolled in and attended the Summit School for the 2000-01 school year. On August 30, 2000, counsel for AACPS notified DB's counsel that an IEP meeting was scheduled for September 11, 2000, however, at DB's request the meeting was pushed back one month to accommodate Dr. Antell. At the October meeting, the IEP Team defined AB as having a learning disability in the area of reading in addition to the already identified disability in written expression. AACPS presented an IEP plan whereby AB would attend 31.25 hours of general (integrated) education per week and various forms of special education each day, amounting to 9.0 hours of special education each week. DB requested time to review the IEP. On October 17, 2000, Dr. Antell wrote AACPS again, contesting the IEP's sufficiency and requesting that it provide AB with (among other things): books on tape, a reader, a note taker, extra time for math assignments, oral presentations of math lessons, a dictation system or similar apparatus and other accommodations.

Again, per DB's request, the IEP meeting was scheduled for November 29, 2000. At the November 29 IEP meeting, the Team considered Dr. Antell's letter as well as a speech/language pathology evaluation from April 2000, which DB presented for the first time. DB additionally requested that AB be placed in a full-day special education program. The IEP Team agreed to review the April 2000 evaluation and discuss it at a follow-up meeting.

On February 8, 2001, DB proposed that an IEP meeting be held on March 14, 2001, and she stated that Dr. Joan McCarthy of the Summit School would attend. At the March 14, 2001 meeting, the IEP Team submitted a revised IEP which called for 10.5 hours of special education. DB again declined to accept the IEP because it did not entail full-time special education. Dissatisfied with AACPS's proposal, DB left AB enrolled at the Summit School and pursued her challenge to the proposed IEP through a due process hearing.

C.

On May 23 and June 6, 2001, an ALJ conducted the due process hearing at AACPS's offices in Annapolis to consider (1) whether the IEP offered by AACPS for the 2000-2001 and 2001-2002 school years was reasonably calculated to provide a FAPE; and (2) if not, whether DB should be reimbursed for the cost of the Summit School. At the hearing, the ALJ admitted fifty-eight exhibits and heard testimony from eight witnesses.

On July 12, 2001, the ALJ issued an order holding that both IEPs were reasonably calculated to offer a FAPE and denying DB's request for reimbursement. In issuing its order, the ALJ considered the parties' joint stipulated findings of fact, as presented at the hearing, and made numerous additional findings of fact based on a preponderance of the evidence. The ALJ first dismissed DB's claim that her son had been improperly evaluated and coded by AACPS, stating there was "no evidence presented at the hearing to show that the evaluation process was flawed, that the Parent was not provided with a meaningful opportunity to participate, or that any factors or considerations presented by the Parent were not duly considered during the process." ALJ Op. at 24 (J.A. 29).

DB's claim rested on her assumption that AACPS should have immediately coded her son as learning disabled based on the KKI evaluation. Indeed, the ALJ considered DB's claim that the lengthy evaluation process impacted her child's academic progress, and found the measures taken by AACPS to diagnose the child were proper, albeit lengthy. ALJ Op. at 24-25 (J.A. 29-30). The ALJ held that "AACPS was not required to rely on the [KKI] report," noting that the responsibility to determine whether a student is eligible for special education is the responsibility of the IEP Team. ALJ Op. at 26-27 (J.A. 31-32).

The ALJ concluded that the IEP was "reasonably calculated" to provide AB educational benefit, citing IDEA's mandate that "to the maximum extent appropriate, children with disabilities be educated with children who are not disabled." ALJ Op. at 33-34 (J.A. 38-39). In holding that the proposed IEP offered a FAPE, the ALJ credited the testimony of AACPS's experts, finding that the child did not require all-day special education and that the proposed IEP offered the least restrictive means of conferring educational benefit to the child. The judge cited AACPS's expert testimony, which she credited, finding that the Summit School program was "overly restrictive." ALJ Op. at 29 (internal quotation marks omitted) (J.A. 34). Thus, the ALJ rejected the views of DB and her experts, who had maintained that AB required an entire school day with special educational services. In so holding, she rejected DB's contention that the child must "be placed in a private school that serves only students with learning disabilities." (J.A. 41.)

In supporting her holding that the IEP offered a FAPE, the ALJ noted her reliance on testimony from Millersville personnel as well as evidence of AB's educational progress as measured by his report card and teacher's comments. ALJ Op. at 30-31 (J.A. 35-36). In reviewing such data, the ALJ noted that AB's reading ability increased nearly two grade levels while attending Millersville despite the fact that he was not receiving special education. *See* ALJ Opinion at 29 (J.A. 34). On the basis of such evidence, the ALJ concluded "there is no indication that the Child's needs cannot be met at Millersville Elementary School." ALJ Op. at 30 (J.A. 35). The ALJ concluded that under IDEA, "[t]he issue is not whether the Summit School is better, or even appropriate, but whether AACPS has offered

. . . an appropriate program for the Child at Millersville Elementary." ALJ Op. at 36-37 (J.A. 41-42). In denying DB's claim, the ALJ acknowledged that while she appreciated DB's concern that given AB's high IQ, he should have performed at a greater academic level at Millersville and in contrast was "thriving" at the Summit School, ALJ Op. at 30 (J.A. 35), "IDEA does not require a program that would maximize a student'[s] potential, but instead simply a program that is appropriate," *id.* at 36 (internal quotation marks and citation omitted) (J.A. 41).

### D.

On January 8, 2002, DB filed a complaint in the United States District Court for the District of Maryland, appealing the ALJ's decision and requesting declaratory and injunctive relief pursuant to IDEA, 20 U.S.C. §§ 1400, *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794, and 42 U.S.C. § 1983. After cross-motions for summary judgment, the magistrate judge granted summary judgment for the Bs, holding that AACPS's IEPs did not offer a FAPE. The court further ordered that AACPS reimburse DB for the costs of Summit School for the 2000-2001 and 2001-2002 school years, holding that the Summit School provided the least restrictive means of providing a FAPE.

### II.

Ordinarily, we review a district court's grant of summary judgment de novo, applying the same standards employed by the district court. *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 522 (4th Cir. 2002) (citations omitted). In the IDEA context, as we explained in *MM*, 303 F.3d at 530-31, we are "obliged to conduct a modified de novo review, giving 'due weight' to the underlying administrative proceedings" (citations omitted). Additionally, "[w]hether a district court has accorded 'due weight' to the administrative proceedings is a question of law — or at least a mixed question of law and fact — to be reviewed de novo by an appellate court." *Id.* at 531. Further, administrative findings in an IDEA case "are entitled to *prima facie* correctness," and "the district court, if it is not going to follow them is required to explain why it does not." *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). Indeed, "we need not defer to factual recitations made by a district court from the adminis-

trative record, because that court stands in no better position than we do in reviewing the record." *Id.*

Finally, the court's role in reviewing the administrative proceeding concerning IDEA "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review." *Rowley*, 458 U.S. at 206; *accord Hartmann*, 118 F.3d at 999. The Supreme Court has directed that "courts must be careful to avoid imposing their view of preferable educational methods upon the States." *Rowley*, 458 U.S. at 207.

III.

A.

On appeal, AACPS argues that the district court erred in finding a violation of IDEA. AACPS contends that, as the ALJ held, the IEP for the 2000-2001 and 2001-2002 school years was (1) reasonably calculated to offer a FAPE and (2) it was the least restrictive environment for the child. We consider these arguments in turn. Overarching all of Appellants' arguments is their contention that the district court erred in failing to accord the ALJ's findings proper deference. *See generally* Appellants' Br. at 27-32. Appellees counter that the district court properly deviated from the ALJ's findings of fact and "made factual findings and legal conclusions *de novo*, with explicit reasons therefore." Appellees' Br. at 22. They argue that AACPS's proposed IEPs did not offer AB a FAPE. Appellees further contend that the IEP was not the least restrictive environment, because — despite outward appearances — "[AB] did not make progress in the general education setting." *Id.* at 33.

We find Appellees' arguments wholly unconvincing. The district court ignored the principles animating IDEA and wrongfully dismissed the ALJ's findings of fact. The district court substituted its own views on educational policy — and those of DB and her experts — for the determinations of the local education officials charged with formulating an IEP. Accordingly, we reverse the district court and hold that the ALJ correctly recognized that AACPS offered AB an IEP that was reasonably calculated to provide him some educational

benefit, thus providing a FAPE and satisfying IDEA's modest requirements. *See Rowley*, 458 U.S. at 203-04; *MM*, 303 F.3d at 532.

B.

In *Tice v. Botetourt County Sch. Bd.*, 908 F.2d 1200 (4th Cir. 1990), we held that "once a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second guess the judgment of education professionals. Neither the district court nor this court should disturb an IEP simply because we disagree with its content. . . . [W]e wholeheartedly agree that once education authorities have made a professional judgment about the substantive content of a child's IEP, that judgment must be respected." *Id.* at 1207-08 (internal citations omitted).[4] The ALJ recognized that the IEP Team's determinations concerning AB's eligibility for special education services were, by law, "solely the responsibility of the IEP team." ALJ Op. at 32 (citing 34 C.F.R. § 300.532(a); Md. Regs. Code tit. 13A

---

[4]Here, there is some controversy concerning whether DB properly presented a substantive or a procedural challenge to the IEP at the administrative hearing. Significantly, the ALJ framed the questions on review as substantive challenges. *See* ALJ Op. at 2 (J.A. 7). Yet even if the Bs had properly lodged their procedural challenge, the ALJ noted there was "no evidence presented at the hearing to show the evaluation process [employed by AACPS] was flawed, that the parent was not provided with a meaningful opportunity to participate . . . ." ALJ Op. at 24 (J.A. 29). The ALJ also concluded "there were no procedural errors in this process." ALJ Op. at 27 (J.A. 32). On appeal, Appellees seem to admit that they had not directly acknowledged a procedural violation, but because AB was denied learning disabled status during 1999-2000 it "contributed to his need for full special ed[ucation] placement" and "the procedural and substantive violations are inextricably intertwined." Appellees' Br. at 41. Regardless, we find that while AACPS's coding process may not have issued with the speed to which school districts should aspire, no procedural violation was present. Indeed, as the ALJ found and as recited in the facts above, *ante*, the delays in coding AB and formulating an IEP are often directly attributable to the parent and her experts. Emblematic of the delays occasioned by DB was her presentation by ambush of a speech/language pathology evaluation at the November 29, 2000 IEP meeting, though that evaluation had been completed seven months earlier.

§ 05.01.06) (additional citation omitted) (J.A. 32). As such, the ALJ found the Team crafted an IEP reasonably calculated to provide AB with some educational benefit and that AACPS officials made professional judgments in accord with federal and Maryland regulations. The ALJ correctly noted that the AACPS IEP Team considered a litany of factors concerning AB's educational background, and proposed an IEP that focused on the child's difficulties in reading and writing, providing him with individualized services to improve in those areas. Further, the ALJ found that the proposed IEPs reflected the studied determinations of AACPS's experts that the child did not require intensive special education in a segregated classroom. Finally, the ALJ correctly and explicitly held that under IDEA, the AACPS IEP Team was not required to rely on the KKI report and complied with state and federal law. ALJ Op. at 27-28 (J.A. 32-33).[5]

C.

DB has nonetheless continuously maintained that the proposed IEPs did not offer a FAPE because AB did not make progress in the general educational setting. DB and her experts assert that AB would regress in general education, and that he required full-time special education services. Undergirding all of DB's arguments are her claims that because AB, a child of above-average IQ, was not fulfilling his potential within a general education setting — and, in contrast, allegedly was "thriving" and "getting the help he needs" at the Summit School — AACPS was not in compliance with IDEA. Although, as discussed above, nowhere does IDEA require that a school system "maximize" a student's potential, *Rowley*, 458 U.S. at 189, the district court ignored the findings of the ALJ and adopted DB's contrary reading of the statute.

---

[5]In contending that AACPS should have determined AB was learning disabled solely on the basis of KKI, Appellees' argument squarely conflicts with the statutory language of IDEA. The statute provides that during the IEP evaluation process, the school district "shall . . . not use any single procedure as the sole criterion for determining whether a child is a child with a disability or determining an appropriate educational program . . . ." 20 U.S.C. § 1414(b)(2). Additionally, the IEP Team has full discretion to "identify what additional data, if any, are needed to determine . . . whether the child needs special education and related services . . . ." *Id.* § 1414(c)(1)(B)(iii).

Whereas the ALJ found that the IEP was formulated to meet AB's educational needs and a general education setting was appropriate because, in part, "the Child made educational progress during the academic year he spent at Millersville, albeit not as great as the Parent had hoped for," ALJ Op. at 30-31 (J.A. 35-36), the district court consistently reached diametrically opposing conclusions, *see e.g.*, Dist. Ct. Op. at 19 (J.A. 73) ("[AB] require[s] full-time placement in special education services in order to make educational progress and to obtain some benefit"); *id.* at 20 (J.A. 74) ("[AB] would have regressed rather than progressed were [AACPS's proposed IEP] to have been implemented.").

Appellees contend, however, that the district court properly discarded the ALJ's factual findings in reversing the administrative body. However, we find the district court repudiated the findings of the ALJ and discarded the expertise of the IEP Team without reason or explanation. Instead, the district court simply adopted the world-view of DB's experts and their perspectives on proper educational policy. Nowhere did the district court try to square its findings with those of the ALJ, although in this circuit the determination of whether an IEP is appropriate is a question of fact. *See DiBuo v. Bd. of Ed. of Worcester County*, 309 F.3d 184, n.8 (4th Cir. 2002); *Doyle*, 953 F.2d at 105. Nor did the district court explain how it, despite the fact that it was reviewing a cold record, reached a conclusion completely contrary to that of the ALJ, who conducted the proceedings. *See Doyle*, 953 F.2d at 105 (noting that the district court "if it is not going to follow [the ALJ's findings of fact], is required to explain why it does not"). Rather than providing the required explanations, the district court substituted its own credibility assessments for those of the ALJ, stating only that it found "the testimony provided by AACPS to have been externally and internally inconsistent, generally garbled and aimed primarily at self-justification. The testimony on behalf of the plaintiffs, in contrast, was clear and consistent. . . . [T]he court finds wholly competent the assessments from the plaintiffs' witnesses . . . and incompetent the assessment from AACPS." Dist. Ct. Op. at 18 (J.A. 72).[6]

---

[6]In purported support of their argument that the district court was correct to jettison the ALJ's findings, Appellees cite a case that is contrary

In doing so, the district court disregarded the ALJ's resolution of conflicting expert testimony. The ALJ carefully considered the views of DB's experts Drs. Antell and McCarthy, implicitly finding them unconvincing while crediting the contrary views of AACPS's experts.[7] Despite the ALJ's findings, the district court's opinion rests almost entirely upon a voluminous discussion of Drs. Antell and McCarthy's testimony. *See* Dist. Ct. Op. at 5-14 (J.A. 59-68). The district court thus reached factual conclusions entirely irreconcilable with those of the ALJ. *E.g.*, "[C]hildren with superior intelligence and learning disorders *require* special treatment in a special classroom setting;" "additional testing that was performed by AACPS was unnecessary;" "what [AB] needed could not . . . be done at this point in an inclusion classroom or general ed classroom;" "[AB] not only could not succeed but would degenerate in a general education setting;" "an appropriate IEP *could not* be implemented at Millersville because the school did not have the ability to integrate all of the goals in every classroom, in every subject, with every teacher." The district court fully adopted Dr. McCarthy's testimony that "placement at Summit was 'absolutely' the least restrictive environment in which [AB] could learn and reiter-

---

to their position. *See* Appellees' Br. at 19-20 (citing *Arlington County Sch. Bd. v. Smith*, 230 F. Supp. 2d 704 (E.D. Va. 2002)). While the district court in *Arlington County* did reverse the ALJ decision, it did so because "the hearing officer succumbed to the temptation which exists for judges and hearing officers alike in IDEA cases, to make his own independent judgment as to the best placement . . . instead of relying on the record evidence presented in the hearing" and "defer[ring] to educators' decisions as long as the IEP provided the child the basic floor of opportunity . . . ." *Id.* at 713, 715 (citations omitted). Here, precisely the opposite situation occurred. The ALJ made the factual finding that a proper IEP had been formulated, yet the district court, like the hearing officer in *Arlington County*, succumbed to its temptation to inject itself into matters of professional educational judgment.

[7]For example, the ALJ stated that DB claimed the IEP goals drafted by Dr. McCarthy were the "only appropriate ones for the Child," and noted that Drs. McCarthy and Antell "testified in great detail as to the inferiority of the AACPS IEP and the superiority of the special education services that the Child is receiving at the Summit School." ALJ Op. at 24 (J.A. 29). Yet the ALJ reached a completely opposite result, holding that the IEP complied with IDEA.

ated that placing [AB] in a general education setting was not appropriate" although that assessment was flatly contradicted by AACPS's experts which the ALJ credited. Dist. Ct. Op. at 14 (J.A. 68).

In its sweeping dismissal of the ALJ's findings — with little explanation other than that on the basis of a cold record it found their experts "generally garbled and aimed primarily at self-justification" — the district court wholly disregarded IDEA's mandate that it "leave[ ] the substance and the details of [the proper education for a disabled child] to state and local officials." *Barnett v. Fairfax County Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991). The ALJ correctly recognized that while AACPS and DB's experts disagreed, IDEA requires great deference to the views of the school system rather than those of even the most well-meaning parent. However, the district court failed to apply the proper standard of review to the ALJ's findings and incorrectly applied IDEA's FAPE standard.

First, the district court did not apply the proper standard in determining whether the IEP at Millersville would provide an educational benefit, rather it essentially assessed "whether the IEP would replicate the benefit to [AB] of the [Summit School program], which [the district court found] successful for him." *G ex rel. SSGT RG v. Ft. Bragg Dependent Sch.*, 324 F.3d 240, 253, *amended on reh'g*, 343 F.3d 295 (4th Cir. 2003). The district court ignored the fact that the ALJ found that AB was obtaining "some educational benefit" at AACPS even when he was receiving *no special education*. *See* ALJ Op. at 29 (noting AB's reading level had increased nearly two grade levels while at Millersville) (J.A. 34); *id.* at 30-31 ("the Child *made educational progress* during the academic year he spent at Millersville, albeit not as great as the Parent had hoped for") (J.A. 35-36).[8] Yet the district court did not even bother to refer to the ALJ's findings that AB made progress at Millersville, rather the Magistrate Judge simply accepted — contrary to the findings of fact and weight of the evidence — Dr. McCarthy's testimony that AB "would degenerate in a general educa-

_____

[8]As discussed above, AB's report card for his year at Millersville, *ante* n.3, also supports the ALJ's findings. *See Rowley*, 458 U.S. at 207 n.28 (recognizing that "achievement of passing marks and advancement from grade to grade" are "important factor[s] in determining educational benefit").

tional setting." Dist. Ct. Op. at 13 (J.A. 67); *see also id.* at 20 ("the Court is convinced that the final IEP offered by AACPS for [AB] was not designed to confer some educational benefit upon him and, in fact, that [AB] would have regressed rather than progressed were such a program to have been implemented") (J.A. 74).

The district court not only evaded the ALJ's findings without explanation, but it also credited the testimony of Dr. McCarthy though it was riddled with internal inconsistencies. Specifically, the Magistrate Judge chose to ignore that Dr. McCarthy acknowledged that AB had "at minimum a satisfactory year" academically at Millersville. (J.A. 353.) Indeed, that admission completely refutes the district court's favored reading of Dr. McCarthy's testimony, and wholly supports the ALJ's finding that AACPS offered a FAPE.

Appellees, however, have contended in their briefs and at oral argument that the district court gave proper deference to the ALJ's findings because the court's 180-degree turn stemmed from "unsupported weight afforded to evidence (rather than on the credibility of witnesses)." Appellees' Br. at 26-27. Appellees' arguments indicate that they simply do not understand the role of the fact finder. For they state: "The ALJ's failure to consider significant parts of testimony and exhibits is doubly of concern. . . . For example, the administrative decision literally only mentions Dr. Antell in passing, *though the district court opinion chiefly relies upon this expert's testimony, and quotes her opinions in unabridged detail.*" Appellees' Br. at 26 n.8 (emphasis added). Appellees appear oblivious that this is *precisely* the role of a fact finder. The ALJ heard extensive testimony from Drs. Antell and McCarthy who claimed the IEP did not offer a FAPE, yet in holding that AACPS provided a FAPE and resting its opinion on an entirely contrary body of expert testimony, the ALJ obviously found the testimony of Appellees' experts unpersuasive. In essence, Appellees' argument is reducible to the sour grapes claim that the ALJ was simply wrong in failing to rely on the testimony of Drs. Antell and McCarthy. Accordingly, that argument merely illustrates just how far the district court had to deviate from the ALJ's findings to reach its result.[9]

---

[9]Additionally, Appellees argue, relying on *Springer v. Fairfax County Sch. Bd.*, 134 F.3d 659, 663 n.* (4th Cir. 1998), that the district court did

In "chiefly relying" on Dr. Antell's testimony, the district court adopted DB's preferred reading of what IDEA requires. DB and her experts testified before the ALJ they believed the Summit School environment was "ideal;" AB was "thriving" and "getting the help he needs there;" and "given his high IQ, he should be performing at a much greater academic level than he has done in the past." ALJ Op. at 30 (internal quotation marks omitted) (J.A. 35). However, as the ALJ recognized, but the district court ignored, this is *not* what IDEA requires. Indeed, "[t]he issue is not whether the Summit School is better, or even appropriate, but whether AACPS has offered . . . an appropriate program for the Child at Millersville Elementary." ALJ Op. at 37 (J.A. 42). As discussed above, IDEA's FAPE standards are far more modest than to require that a child excel or thrive. The requirement is satisfied when the state provides the disabled child with "personalized instruction with sufficient support services to permit the child to benefit educationally from the instruction." *Rowley*, 458 U.S. at 203; *accord MM*, 303 F.3d at 526-27; *Hartmann*, 118 F.3d at 1001. In this case, the record shows that AACPS's proposed IEPs offered AB a FAPE.

## IV.

Given that we find the district court erred in overturning the ALJ's findings that the IEP provided a FAPE, it follows *a fortiori* that the

---

not need to accord the ALJ's findings any deference because the "administrative decision assigns an inaccurate degree of weight to critical evidence," and the ALJ decision was "cursory and conclusory." Appellees' Br. at 25-26. *Springer*, however, is readily distinguishable from this case. In *Springer*, the local hearing officer did *not* rely on expert testimony but "[r]el[ied] *exclusively* on a letter written by a psychiatrist." 134 F.3d at 662 (emphasis added). Here, however, the ALJ conducted a formal hearing and considered witness testimony and multiple exhibits. The ALJ was in a far superior position to evaluate such witness testimony than the court below, which relied on a body of completely contrary testimony within the cold record. *Springer* is also distinguishable because the courts were in a position identical to the local hearing officer in evaluating the letter — a document within a cold record — upon which the officer's decision was based. Moreover, the ALJ's opinion here is anything but conclusory and cursory. To the contrary, the ALJ made extensive factual findings and applied governing precedent "explain[ing] the result with some care" as *Springer*, *supra*, requires.

AACPS IEP, with its integrated curriculum, was less restrictive than the wholly segregated Summit School. IDEA requires mainstreaming that Summit School does not provide. 20 U.S.C. 1412(5)(B); *see DeVries*, 882 F.2d at 876. While the district court stated that it was "mindful of the Congressional preference for mainstreaming," Dist. Ct. Op. at 19 (J.A. 73), its holding that only the wholly segregated educational environment that Summit provided offered a FAPE refutes such purported mindfulness. The district court held that AB *required* a "full-time placement" in a program with learning disabled children of "above-average intelligence," Dist. Ct. Op. at 19 (J.A. 73). The lower court then took judicial notice of a Learning Disabled/Gifted and Talented Program designed for learning disabled students with high cognitive ability in Montgomery County. *Id.* at 19 n.3. In holding that the appropriate placement for AB was "full-time placement in special education services . . . with children of above-average intelligence," the court erroneously substituted its judgment for those of education professionals. *MM, supra*; *Rowley, supra*. The district court's holding bears repeating: the Magistrate Judge found the least restrictive way — indeed the only way — to educate AB was to place him in a wholly segregated special education classroom in which students were also "gifted and talented," while also forcing AACPS to pay for such a placement. At minimum, the district court showed no "reluctan[ce] to second-guess professional educators" at AACPS. *MM*, 303 F.3d at 532.

First, there was no evidence in the record as to whether AACPS had such a Gifted and Talented program for learning disabled students in which AB could be enrolled. Additionally, there was no evidence in the record showing that AB would be devoid of interaction with children of "above-average intelligence" in classes at Millersville. Finally, there was no evidence in the record regarding the program at Colonel E. Brooke Lee *Middle School*, which the district court so readily endorsed, despite the fact that AB was an *elementary school* student during the period at issue. Regardless of the educational efficacy of that program, or the schooling at Summit, the FAPE analysis amounts to whether the *AACPS IEP* was reasonably calculated to confer some educational benefit. 20 U.S.C. § 1401(a)(17); *MM*, 303 F.3d at 532. In applying the wrong standard, the district court "substitut[ed] [its] own notions of sound educational policy for those of local

school authorities." *MM*, 303 F.3d at 531 (internal quotation and citation omitted).

Even after skewing the proper analysis of whether AACPS provided some educational benefit, the district court still had to ignore the ALJ's factual findings regarding Summit to reach its result. The district court first disregarded the ALJ's clear factual finding that AB had "mixed" results at Summit.[10] Instead, the district court conclusorily stated that at Summit: "[AB] vaulted three grade levels in mathematics, which tends to support the assessments of Drs. Antell and McCarthy that the alternative strategies employed at Summit, and not recommended by AACPS, were working and were permitting AB to obtain some benefit . . . ." Dist. Ct. Op. at 19 (J.A. 73). In relying on this evidence and making such a determination, the district court made no mention of AB's inconsistent progress at Summit in the areas of reading and written language — the very areas in which all parties agree that he was learning disabled. Indeed, the record consistently reflects that throughout his educational history, AB regularly scored above his age and grade level in mathematics.

In sum, the magistrate judge ignored the congressional preference for mainstreaming, clearly and strongly substituted its views on education and IDEA for that of Congress, and failed to accord the ALJ's factual findings the requisite degree of deference. In reversing the ALJ, the district court consistently failed to heed "IDEA's recognition that federal courts cannot run local schools. Local educators deserve latitude in determining the individualized education program most appropriate for a disabled child. The IDEA does not deprive these educators of the right to apply their professional judgment." *Hartmann*, 118 F.3d at 1001. As the ALJ determined, the AACPS IEP offered an integrated education, and AB had already made progress within that setting.[11]

---

[10]The ALJ found AB's performance in math at Summit was "solid" but "his performance in written language and reading/language arts was inconsistent . . . ." ALJ Op. at 18 (J.A. 23).

[11]As a final attempt to support its finding that the Summit School was the least restrictive placement, the district court again ventured outside the record to state "that not all the students at Summit have been defined

V.

Because we hold that AACPS offered AB a FAPE, the issue of reimbursement under *Burlington*, *supra*, and *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993), is clearly inapplicable.

VI.

For the reasons stated above, we reverse the judgment of the district court and remand with instructions that the district court enter summary judgment in favor of AACPS. Accordingly, we also vacate the district court's order that AACPS reimburse DB for the costs of educating her son at the Summit School during the 2000-2001 and 2001-2002 school years.

*REVERSED AND REMANDED*

---

by their school systems as learning disabled." Dist. Ct. Op. at 20. (J.A. 74.) This finding, however, is a strawman. The magistrate judge had already determined that "not only did [AB] *require* full-time placement in special education services in order to make educational progress and to obtain some benefit from education services but also that the *appropriate placement was and is with children of above-average intelligence*." *Id.* (emphasis added). Neither party disputed that Summit was a segregated learning disabled-exclusive school, and indeed Summit's own publications support that finding. *See* Summit School, *Summit Specifics* ("The Summit School is a private, non-profit, co-educational day school established in September of 1989 to promote literacy and success for students with language-based *learning differences*."), *available at* http://www.thesummitschool.org/About_Summit/Summit_Specifics.htm (emphasis added); *see also* Summit School, *1998-1999 National Blue Ribbon School* (stating that in 1999 when the school won a U.S. Department of Education Blue Ribbon Award, "Summit was one of the three private schools chosen, and *the only special education school of the 266 named*"), *available at* http://www.thesummitschool.org/About_Summit/Blue_Ribbon_School.htm.