**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-2259**

---

CRYSTAL HULTZ,

> Plaintiff – Appellant,

>> v.

FRANK BISIGNANO, Commissioner of Social Security Administration,

> Defendant – Appellee.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore. Brendan A. Hurson, District Judge.  (1:22-cv-03179-MBAH)

---

Argued:  September 10, 2025                    Decided:  December 15, 2025

---

Before GREGORY, AGEE, Circuit Judges, and Roderick C. YOUNG, United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Reversed and remanded for calculation of benefits by published opinion.  Judge Gregory wrote the opinion, in which Judge Young joined.  Judge Agee wrote a separate opinion concurring in part and dissenting in part.

---

**ARGUED:**  Jeffrey R. Scholnick, JEFFREY R. SCHOLNICK, P.A., Timonium, Maryland, for Appellant.  Joel Lee Johnson, SOCIAL SECURITY ADMINISTRATION, Baltimore, Maryland, for Appellee.  **ON BRIEF:**  Brian C. O'Donnell, Associate General Counsel, David N. Mervis, Senior Attorney, William Feldman, Special Assistant United States Attorney, Office of the General Counsel, SOCIAL SECURITY ADMINISTRATION, Baltimore, Maryland; Erek L. Barron, United States Attorney, OFFICE OF THE UNITED STATES, Baltimore, Maryland, for Appellee.

---

GREGORY, Circuit Judge:

This case is about crediting a patient's accounts of the chronic, debilitating, and little-understood illness fibromyalgia. Appellant Crystal Hultz suffers from a host of medical conditions, including lupus, spinal disorders, knee osteoarthritis, ulnar neuropathy, factor V Leiden with a history of transient strokes, and, most significantly to this appeal, fibromyalgia. Many of her conditions have been partially or essentially resolved, but she testified that her fibromyalgia lingers, causing her to be bedridden for days and dependent on her family for everyday living. Ms. Hultz applied for Social Security disability benefits, but was denied. Ultimately, the ALJ found her subjective testimony about her symptoms to be unsupported by medical and other evidence.

This case must be guided by our precedent in *Arakas v. Commissioner*, 983 F.3d 83 (4th Cir. 2020), which held that ALJs may not rely on objective medical evidence even as just one of multiple factors to discount a claimant's subjective complaints regarding symptoms of fibromyalgia. Once again, we reiterate that fibromyalgia is a serious and mysterious condition, disproportionately affecting women, that our current science is incapable of observing through objective medical testing. Accordingly, we must give due weight to Ms. Hultz's subjective testimony about the severity of her symptoms and reverse the ALJ's decision, remanding for a calculation of benefits.

\*\*\*

2

I.

On January 22, 2014, Plaintiff Crystal Hultz filed an application for Social Security Disability Insurance benefits, and on March 21, 2014, an application for Supplemental Security Income benefits. She alleges a disability with an onset date of January 1, 2014, based on various conditions including lupus, fibromyalgia, depression, and anxiety.

Both applications were denied on October 2, 2014, and then denied again after a Request for Reconsideration. After appealing, a hearing was held before administrative law judge ("ALJ") Hope Grunberg on December 15, 2016. Before ALJ Grunberg issued a decision, the matter was transferred to ALJ Shawn Bozarth, who conducted a supplemental hearing on December 17, 2017. ALJ Bozarth denied the applications, and the Social Security Administration ("SSA")'s Appeals Council denied review.

Ms. Hultz filed suit in the United States District Court for the District of Maryland, appealing the Appeals Council's denial. On October 21, 2019, United States Magistrate Judge A. David Copperthite remanded the matter back to the ALJ for two errors: failing to consider Ms. Hultz's ulnar neuropathy at subsequent steps of the five-step disability evaluation after classifying it as a non-severe impairment and omitting Ms. Hultz's fibromyalgia from the analysis.

On remand, ALJ Clary Simmonds held a third hearing on June 22, 2022. Ms. Hultz's testimony across all three hearings remained consistent regarding her chronic and debilitating fibromyalgia symptoms. Nonetheless, ALJ Simmonds denied Ms. Hultz's application on August 10, 2022.

On December 8, 2022, Ms. Hultz initiated this suit in the District of Maryland. Then-Magistrate Judge Brendan A. Hurson denied Ms. Hultz's motion for summary judgment and affirmed ALJ Simmonds' denial of benefits. Ms. Hultz now appeals Judge Hurson's decision.

A.

Ms. Hultz is a younger woman, born in 1987, who used to work as a computer operator in an office job. In December 2013, Ms. Hultz stopped full-time work due to her conditions. She continued to do part-time work at Walmart and lunch duties work at a school after her alleged disability onset date of January 1, 2014, but not much, earning only $478.08 in 2014 and $222.20 in 2019.

Ms. Hultz suffers from a host of medical impairments: fibromyalgia, lupus, ulnar neuropathy, factor V Leiden with a history of transient ischemic attack, bilateral knee osteoarthritis, lumbar degenerative facet hypertrophy, cervical degenerative disease and radiculopathy (now post diskectomy and fusion), and depression and mood disorder.

Ms. Hultz was diagnosed with lupus in 2011 and fibromyalgia in 2013. Before she filed for disability benefits in January 2014, medical records show that Ms. Hultz had been reporting ups and downs of general fatigue, various kinds of pain, and numbness in her left hand almost monthly in the preceding year. Around the time that she filed for benefits, in late January 2014, Ms. Hultz reported that her symptoms interfered with her ability to perform daily tasks, including difficulty with opening jars, handwriting, turning keys, preparing meals, performing heavy household chores, accomplishing yard work, and carrying heavier objects with the hand that suffered from pain and numbness.

4

During 2014 and through the beginning of 2015, Ms. Hultz's doctors also began to diagnose several bone and spine issues. She reported transient ischemic attacks (strokes) from factor V Leiden as well, with symptoms of decreased sensation on the left side of her face and arm. She suffered from depression and was not always compliant with her medications. By September 2014, Ms. Hultz was seeing several different doctors, including a rheumatologist, a pain specialist, a hematologist, a neurologist and a primary care doctor. Medical notes indicate that Ms. Hultz's symptoms in 2014 had caused her to be wheelchair dependent and cane dependent for a while, and to rely on a home nurse.

Ms. Hultz has received a variety of treatments for her numerous medical issues, including medications, injections, therapy, and surgery. Notably, on February 25, 2015, Ms. Hultz underwent a diskectomy and fusion, surgical procedures to treat her spine issues. Post-surgery medical notes from March and April 2015 indicate that this surgery and its related treatments were successful in resolving at least some of her issues—that she showed "tremendous improvement" with respect to radicular symptoms, JA 672, that "her pain and any weakness that she was experienc[ing] has essentially resolved," *id*., that "radicular symptoms down her arms have almost completely resolved," JA 844, and that she has "very little residual symptoms" from her spinal issues. *Id.* Indeed, Ms. Hultz reported to her doctors that by September 8, 2015, she was "able to walk for farther distances and longer periods of time without pain." JA 660. She was also able to be "very active with her children, doing a lot of walking and climbing." JA 839. She reported that her pain regimen worked well "in reducing her symptoms, allowing her to function to continue to take care of her children." *Id.*

5

However, Ms. Hultz continued to report pain for years following the surgery and treatments, as well as accompanying depression and mood disorder. The same pain management doctor that noted the improvement of her symptoms, Ruben Reider, also noted throughout these check-ins that Ms. Hultz would rate her symptoms, sometimes as low as 4/10, sometimes as high as 10/10. For example, in monthly to weekly check-ins throughout late 2015 and 2016, Dr. Reider noted that Ms. Hultz was reporting "chronic pain" that was "aching, throbbing, and stabbing." JA 799–839. In 2017, Dr. Reider noted that Ms. Hultz continued to report this pain, which she was managing with gel injections, steroid injections, an opioid program, and medications. While reporting her pain and symptoms, Dr. Reider often simultaneously noted that her medication regimen "has worked well." JA. 889–917. From 2018 to 2022, Ms. Hultz regularly visited Clearway Pain Solutions and its various providers to check in on her chronic pain and receive medications, although these notes do not specify her condition with any narrative.

Of particular note are the records from rheumatologist Dr. Nasser Nasseri, one of Ms. Hultz's treating physicians. Dr. Nasseri began to treat Ms. Hultz for lupus and fibromyalgia beginning on December 23, 2015. On that day, Dr. Nasseri noted that with respect to her lupus and joint issues, she had "significant improvement although she has history of fibromyalgia." JA 761. Despite improvement, he indicated that she continues to have "diffuse arthralgias, myalgias, and fatigue and the stiffness can last for several hours and is diffuse." *Id*. In March 2016, Dr. Nasseri noted that Ms. Hultz's chronic pain and fatigue made "daily activities very difficult" and that she required help from her husband for daily care, such as cleaning bathing, dressing and cooking. JA 761.

6

Although there was an eight-month gap in Ms. Hultz's treatment with Dr. Nasseri, her sessions with him resumed in late 2016. With regard to her lupus, Dr. Nasseri noted that it "remains well controlled" with medication and that he did not "see any evidence of activity or inflammation." JA 764. Nonetheless, Dr. Nasseri also noted that her symptoms were "mostly coming from her fibromyalgia." JA 784, 786. She reported tension headaches, constant fatigue, and an inability to sleep for more than four hours a night. At times, Dr. Nasseri reported that medication appeared to have helped with fibromyalgia symptoms. At times, he noted that medication did not help.

On November 22, 2017, after a nearly year-long gap in treatment, Dr. Nasseri filled out a form indicating that Ms. Hultz's fibromyalgia limited her activities of daily living, in maintaining social function, and in completing tasks in a timely manner due to deficiency in concentration, persistence, and pace, although he did not specify the degree of limitations on that form.

After another gap in rheumatology treatment, in January 2019, Ms. Hultz began rheumatology treatment with Dr. Ebrahim Talebi. At this point, Ms. Hultz was still noting arthralgia (joint paint) and fatigue and had not been taking her medication for a few months due to psychiatric issues. Dr. Talebi noted that after obtaining the care of a psychiatrist, the psychiatric issues preventing Ms. Hultz from taking medication had been resolved. At a check-in in April, Dr. Talebi noted that while Ms. Hultz's lupus was controlled, she "complains of severe fatigue likely due to fibromyalgia." JA 1380. Then after a seven-month gap, in November 2019, Ms. Hultz again reported pain all over and fatigue, for which Dr. Talebi restarted her on some medication.

7

On June 3, 2022, Ms. Hultz's care provider noted at her annual well woman check-up that she had discontinued all medications and was no longer under the care of a rheumatologist for lupus. The same provider, N.P. Andrea Schafer, also submitted a medical opinion for Ms. Hultz's applications that she could sit for eight hours continuously, or stand/walk for four hours with rest. N.P. Schafer opined that Ms. Hultz could occasionally carry up to ten pounds, frequently bend, occasionally squat and crawl, never climb, and occasionally reach above shoulder level. She opined that Ms. Hultz could use her hands for grasping and fine manipulation but could not push, pull, or use her feet for repetitive movements. She indicated that Ms. Hultz could not work.

A few other non-treating physician opinions are relevant. Dr. Iqbal Singh performed a Consultative Examination on July 14, 2014, for Ms. Hultz for her disability benefits applications. Dr. Singh stated that he believed Ms. Hultz was disabled—specifically, that she "has conditions which will never go away, and they are chronic. She cannot even take care of her own children and she cannot work anymore." JA 616–17. He noted that she "gets migraines everyday." *Id.*

Two months later, SSA sent Ms. Hultz for second consultation with Dr. Pavan Shawney. Dr. Shawney contradicted Dr. Singh's finding, noting that "[o]bjectively, I am not impressed with any weakness" and that Dr. Shawney believed she had a "component of 'malingering.'" JA 621. He noted that her "fatigue and aches and pains all over" did "not fit the category of fibromyalgia." *Id.* He also recommended that "pain medication should be cut back and the less medication she takes the better it is." *Id.*

8

As a part of Ms. Hultz's application review, state agency medical consultants Dr. M. Lowen and Dr. M. Ahn provided opinion evidence that despite her impairments, Ms. Hultz could perform light work. In response to interrogatories in March 2017, medical expert Dr. Anne Winkler wrote that Ms. Hultz's lupus, fibromyalgia, and degenerative disc disease were not presumptively disabling. Dr. Winkler also wrote that Ms. Hultz could lift or carry 15 pounds occasionally and 10 pounds frequently, and stand/walk for two hours a day and sit for eight hours a day.

B.

At her June 22, 2022 hearing, Ms. Hultz testified that she still suffers from extreme fatigue. She would have four to eight flares of pain and fatigue each month, and that during these flares, she could not get out of bed. During these flares, she could be in bed for one day or for several. During these flares, which would happen unpredictably, she could only get up to use the bathroom herself, but not much more than that. Even if she sits for a long period of time, she experiences stiffness and pain.

Ms. Hultz lives with her husband, three teenage children, and grandmother, who retired to move in with Ms. Hultz. Her grandmother helps her with her children and does most of the driving, cooking, cleaning, and laundry. Ms. Hultz also struggles with memory and comprehension due to her fibromyalgia, forgetting to take her medication.

Ms. Hultz's grandmother, Blanche Butcher, corroborated Ms. Hultz's testimony. Ms. Butcher testified that Ms. Hultz has both good days and bad days but needed to be in bed on bad days. In the last 30 days prior to the hearing, Ms. Hultz had to be in bed for four, five days. Even on days when Ms. Hultz was not bedridden, she would often need to

9

lie down for hours during the day. Ms. Hultz might start to clean or cook but could not finish the task out of fatigue. She could go to the grocery store but would need to rest in bed afterward. To manage Ms. Hultz's symptoms, Ms. Butcher performed the bulk of the critical daily tasks—she did cooking and laundry, took care of the children, and ensured that Ms. Hultz took her medications.

C.

To determine whether a claimant has a qualifying disability under the Social Security Act, ALJs are to use a "five-step sequential evaluation process" set forth in 20 C.F.R. § 404.1520(a)(4).

At step one, the ALJ must determine whether the claimant has been working. At step two, the ALJ considers the medical severity of the impairments. If the claimant has been working or does not have a severe impairment that meets the durational requirement, the ALJ must find that the claimant is not disabled. *Id.* § 404.1520(b)(i)–(ii).

At step three, the ALJ determines whether the claimant's impairment or combination of impairments is of a severity that meets or equals an impairment listed in the regulations. If so, the claimant is disabled. *Id.* § 404.1520(b)(iii). If not, the analysis proceeds to the next step.

At step four, the ALJ determines the claimant's Residual Functional Capacity ("RFC"), which is the claimant's maximum ability to do physical and mental work activities, considering her impairments and their limitations, on a sustained basis. *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 90 (4th Cir. 2020); 20 C.F.R. § 404.1545 (a)(4). Policy interpretation SSR 96-8p guides an ALJ in how to determine a claimant's RFC,

10

instructing that the ALJ must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8P, 1996 WL 374184, at *1 (July 2, 1996). The ALJ must then express the RFC "in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." *Id.*

At the fifth and final step, the ALJ considers the RFC alongside the claimant's age, education, and work experience to determine if the claimant can adjust to other work. If yes, then the claimant is not disabled. 20 C.F.R. § 404.1520(a).

For the first four steps, the burden of proof lies with the claimant. At step five, the burden shifts to the Commissioner. *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017).

## D.

The ALJ denied Ms. Hultz's applications for benefits, concluding that Ms. Hultz was not disabled from January 1, 2014, to the date of the decision, August 15, 2022. In applying the five-step framework, the ALJ first determined that Ms. Hultz was not working during the relevant period. Second, the ALJ found that Ms. Hultz suffered from the following severe impairments: depression and mood disorder, lupus, fibromyalgia, factor V Leiden, bilateral knee osteoarthritis, lumbar degenerative facet hypertrophy, and post-operative cervical degenerative disc disease. The ALJ also found that Ms. Hultz had non-severe impairments: post-operative ulnar neuropathy, headaches, and a history of obesity.

At step three, the ALJ determined that Ms. Hultz did not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations. Specifically, with respect to Ms. Hultz's fibromyalgia, the ALJ noted that

11

fibromyalgia, which is not a listed impairment, must medically equal a listing such as 14.09D for inflammatory arthritis. The ALJ determined that the fibromyalgia did not equal this listing because (1) Ms. Hultz did not have a documented need for a mobility device; (2) she did not have involvement of two or more organs and body systems, with one involved to at least a moderate level of severity, (3) she did not have ankylosing spondylitis or other spondyloarthropathies, (4) and she did not have a marked limitation in activities of daily living, social functioning, or completion of tasks in a timely manner.

> At step four, the ALJ determined:

> I find that the claimant has the residual functional capacity to lift, carry, push or pull up to 10 pounds occasionally and less than 10 pounds frequently. She can sit for 8 hours of an 8-hour workday, stand for 4 hours of an 8-hour workday, and walk for 4 hours of an 8-hour workday. She can occasionally climb ramps or stairs. She can never climb ladders, ropes, or scaffolds. She can frequently stoop or balance. She cannot kneel, crouch, or crawl. She can frequently use the bilateral upper extremities to push, pull, handle, or reach. She can have no more than occasional exposure to extreme temperatures, to bright sunlight, and to dusts, fumes, odors, gases, and poor ventilation. She can have no exposure to hazards such as moving machinery or unprotected heights. She can understand, remember, and carry out simple instructions and routine, repetitive tasks of unskilled work. She can make occasional work-related decisions.

JA 947. In making this determination, the ALJ found that Ms. Hultz and her grandmother's testimony about the intensity, persistence, and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record." The ALJ based this conclusion on an overview of Ms. Hultz's medical history, beginning with January 2014, that observed the records where Ms. Hultz reported improvement of symptoms, failure to consistently take medication, and gaps in seeking treatment.

12

The ALJ further disregarded the opinion of Dr. Iqbal Singh, finding that the doctor's statement that Ms. Hultz was disabled was an administrative finding that failed to provide specific functional limitations.  The ALJ gave some weight to the opinion of medical expert Anne Winkler but found that a limitation to only two hours of standing was "inconsistent with the claimant's normal gait, her ability to walk for farther distances and longer period of time without pain, and her ability to be very active with her children, doing a lot of walking and climbing."  JA 956.  The ALJ gave some weight to the opinion of N.P. Andrea Schafer but found "no support for a complete limitation on pushing/pulling with the hands or operating foot controls," given that Ms. Hultz's "pain regimen generally worked well in reducing her symptoms, allowing her to function to continue to take care of her children."  JA 956.  The ALJ gave "little weight" to Dr. Nasseri's opinion that Ms. Hultz's fibromyalgia significantly limited her, since he "did not specify the degree of limitations" and that there was a year-long gap in treatment before the doctor gave that opinion.  JA 956.

Finally, at step five, the ALJ determined that jobs existed in significant numbers that Ms. Hultz could perform.  These included eyeglass frame polisher, document preparer, and call out operator.

## II.

We uphold a Social Security disability determination "if the ALJ applied correct legal standards and if the factual findings are supported by substantial evidence." *Drumgold v. Comm'r of Soc. Sec.*, 144 F.4th 596, 604 (4th Cir. 2025).  Substantial evidence "consists of more than a mere scintilla of evidence but may be less than a preponderance."

13

*Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015) (internal quotation marks and citation omitted). "In assessing whether there is substantial evidence, the reviewing court should not undertake to reweigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the agency." *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (cleaned up). Though this is a deferential standard, ALJs are nonetheless required to "'build an accurate and logical bridge' from the evidence to their conclusions." *Arakas*, 983 F.3d at 94 (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)).

### III.

Ms. Hultz raises two issues on appeal: (1) whether the ALJ properly performed the RFC analysis under *Arakas* and SSR 96-8p and (2) whether the ALJ properly evaluated the opinions of treating physicians.

### A.

The foundation of Ms. Hultz's appeal is the 2020 Fourth Circuit decision *Arakas v. Commissioner*, 983 F.3d 83. We begin with a review of our binding precedent.

### 1.

In *Arakas*, this Circuit held that ALJs may not rely on objective medical evidence even as just one of multiple factors to discount a claimant's subjective complaints regarding symptoms of fibromyalgia. In a set of very similar facts, Arakas filed for SSDI benefits alleging disability based on various conditions, including fibromyalgia, carpal tunnel syndrome, and degenerative disc disease. Arakas was being treated by a rheumatologist from 1996 to 2017, who indicated that Arakas suffered from chronic and diffuse muscle

14

pain, stiffness, and fatigue with waxing and waning severity. The treating physician opined that Arakas could not perform even light work. Multiple state agency consultants disagreed. At the hearing, Arakas testified that her pain would flare for up to a week, leaving her unable to work for half a month. She struggled to sit and could only stand for two hours. She experienced poor concentration and grogginess. She did not experience any significant improvement from treatment, relied heavily on family for basic chores, and often could not be active after noon. *Id.* at 92–94.

On review, the ALJ found at step three that Arakas's impairments did not meet any impairment listed in the regulations. *Id.* at 94. When assessing her RFC at step four, the ALJ determined that she could perform light work. He found that her "subjective complaints regarding the severity, persistence, and limiting effects of her symptoms were 'not reliable' and not 'completely consistent with the objective evidence.'" *Id.* He also accorded 'little weight' to the treating rheumatologist's opinions while assigning 'significant weight' to the state agency consultants' opinions. *Id.* Ultimately, the ALJ denied Arakas's application for benefits.

This Court reversed, finding that the ALJ's decision applied an incorrect legal standard and was not supported by substantial evidence. We also found that the ALJ erred in according little weight to the treating rheumatologist's opinion, a matter that we will return to in a later section.

First, we reiterated that claimants are "entitled to rely exclusively on subjective evidence to prove that [their] symptoms were so continuous and/or severe that they prevented [the claimant] from working a full eight-hour day." *Id.* at 96 (citing *Hines v.*

15

*Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006)) (cleaned up). This was not a new holding, but one that we have repeatedly emphasized over the years and that the Commission eventually embraced in a policy interpretation. *See Hines*, 453 F.3d at 564. We found that the ALJ in *Arakas* failed to adhere to this standard when he required that her subjective descriptions of her symptoms to be supported by objective medical evidence. *Arakas*, 983 F.3d at 96. We noted that this "type of legal error is particularly pronounced in a case involving fibromyalgia—a disease whose symptoms are entirely subjective." *Id.* (cleaned up). As both Arakas's rheumatologist and other circuit courts have observed, physical examinations of fibromyalgia patients did not produce clinical and laboratory abnormalities, and usually yielded a full range of motion, no joint swelling, and normal muscle strength and neurological reactions. *Id.* Accordingly, we held that "ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence." *Id.* at 97.

Second, we found that the ALJ's decision was unsupported by substantial evidence because it (1) selectively cited evidence from the record and misstated and mischaracterized material facts, (2) found Arakas's complaints to be inconsistent with her daily activities, and (3) failed to consider fibromyalgia's unique characteristics when reviewing Arakas's medical records. *Id.* at 98. Specifically, we reiterated that an ALJ "has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Id.* (quoting *Lewis*, 858 F.3d at 869). Moreover, we stated that a "claimant's

16

inability to sustain full-time work due to pain and other symptoms is often consistent with her ability to carry out daily activities." *Id.* at 101. Thus, evidence of a claimant's ability to live independently and with dignity, and participate in everyday activities, could not and cannot be used to penalize their claim for benefits. *Id.* Finally, we emphasized that neither conservative courses of treatment nor isolated incidents of symptom improvement are appropriate reasons to discount fibromyalgia severity, because the condition is exacerbated by narcotic painkillers and the condition waxes and wanes. *Id.* at 101–02.

Ultimately, we reversed the ALJ's decision, finding that the undisputed evidence reflected that Arakas was disabled. *Id.* at 111–12.

## 2.

Under *Arakas*, the ALJ failed to apply the correct legal standard when the decision heavily relied on objective medical criteria to assess Ms. Hultz's fibromyalgia. This failure is salient in two aspects of the decision. First, when evaluating Ms. Hultz's fibromyalgia symptoms under step three of the five-step evaluation framework, the ALJ used objective medical criteria, such as reliance on mobility devices and the involvement of organs and body systems, to determine whether her fibromyalgia met a listing such as for inflammatory arthritis. Second, when discounting Ms. Hultz and her grandmother's testimony under the step four RFC analysis, the ALJ stated—in language that is nearly identical to the reversed ALJ decision in *Arakas*—that the ALJ did so because "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." JA 948. This is in clear contravention of *Arakas*.

17

Although the ALJ considered other evidence, such as whether Ms. Hultz had a marked limitation in activities of daily living, social functioning, or completion of tasks in a timely manner, the bulk of the ALJ's decision clearly rested on objective medical criteria. In fact, the Commissioner in *Arakas* similarly argued that the ALJ did not err because he considered other evidence such as daily activities—an argument we rejected because the ALJ opinion indicated that the "lack of objective medical evidence was his chief, if not definitive, reason for discounting Arakas's complaints." *Arakas*, 983 F.3d at 97. More critically, *Arakas* held that ALJs may not rely on objective medical evidence even as just one of multiple factors to discount a claimant's subjective complaints regarding symptoms of fibromyalgia. *Id.* at 97. Unfortunately, that is exactly what the ALJ did, and the Commissioner's attempt to recharacterize the ALJ's opinion is unavailing.

3.

The ALJ's decision also fails to be supported by substantial evidence. Policy interpretation SSR 96-8p states that an ALJ's "assessment must be based on all the relevant evidence" and must include a "narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence[.]" SSR 96-8P, 1996 WL 374184, at *1 (July 2, 1996). In addition, the ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* The assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can and cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

18

Here, although the ALJ provided somewhat of a narrative regarding how the evidence supported the decision, the opinion is better characterized as a summary of the medical record than as a detailed analysis of fact and law. Moreover, though we must recognize that Ms. Hultz's facts are not as compelling as the facts in *Arakas*, the logic of the *Arakas* substantial evidence analysis must carry over to her case.

As an initial matter, it appears evident from the record that many of Ms. Hultz's symptoms from 2014 and 2015 have been resolved or are managed well as a result of her treatment. Her spine-related issues have at least been partially corrected with surgery, her ulnar neuropathy (numbness in the left hand) appears managed, and her lupus generally appears stabilized. The focus of this appeal is Ms. Hultz's fibromyalgia. According to her hearing testimony, at the time of the ALJ's decision, her fibromyalgia had been far from resolved. And with regards to her fibromyalgia symptoms, the ALJ's decision is unsupported by substantial evidence for the following reasons.

First, the ALJ omits discussion of some important facts from the medical record that contradict the decision. While the ALJ notes several records that indicate Ms. Hultz's symptoms were improving and pain medications were effective, the ALJ does not acknowledge or discuss that through late 2017, Ms. Hultz was nearly monthly reporting to Dr. Reider that her symptoms and pain would rate from anywhere between 4/10 to 10/10. *See* JA 661–66, 746, 755–58, 761–83, 799–831, 875–917, 934. The ALJ does note that from 2018 to 2022, Ms. Hultz switched providers and no longer had narrative documentation on what she was experiencing, but records nonetheless indicate that chronic pain continued to be a problem for which she sought treatment. JA 1394–1421, 1465–1703.

19

Had the ALJ considered the years of pain management narratives from Dr. Reider in conjunction with the records from 2018 to 2022, the ALJ ought to have concluded that Ms. Hultz's waxing and waning reports corroborated her testimony on chronic fibromyalgia.

Second, although the ALJ does otherwise provide a lengthy seven-page summary of Ms. Hultz's medical record, there is very little analysis and discussion within this summary. At the conclusion of this overview, the opinion summarily says, "the above residual functional capacity assessment is supported by the entirety of the evidence, including the claimant's treatment history, her physical examinations and psychological evaluations, and her own reports regarding her function limitations." JA 957. It is difficult to discern which records and what facts the ALJ based each of the RFC determinations on. Instead, the Commissioner's brief on appeal has had to conduct this analysis and make these arguments.

But even the Commissioner's brief does not put forth compelling analysis about the symptoms of fibromyalgia. The Commissioner states that the ALJ analyzed Ms. Hultz's treatment and response to treatment, finding that her fibromyalgia symptoms were successfully managed with prescription medications. This is not quite correct; the ALJ does not analyze but merely summarizes Ms. Hultz's history of treatment and the corresponding medical notes. These notes include that in June 2022, Ms. Hultz was "not currently under care of rheumatology for lupus and was off meds," JA 955, and that at several points in Ms. Hultz's treatment history, there were significant gaps. JA 953, 954. This is far from evidence that her fibromyalgia was successfully managed. To the contrary, the record reflects that throughout the years, Ms. Hultz has struggled to stay on medication due to a combination

20

of depression and memory issues because of her fibromyalgia. JA 631, 691, 696, 715, 720, 725–27, 951 (noting that even in February 2015, prior to her surgical treatment, she continued to be "very noncompliant with therapeutic monitoring as well as follow-ups"); JA 989, 991–92 (testifying that her "fibro fog" caused her to forget to take medication). The record also reflects that one month later, in August, Ms. Hultz and her grandmother confirmed by testimony that she was back on medication. JA 989, 991–92.

Moreover, we must consider the practical cost of seeking treatment—time, money, and physical exertion. Given that there is no treatment for fibromyalgia and painkilling medication may worsen the condition over time, a fibromyalgia patient may reasonably lapse in office visits or choose to forgo them altogether. *See* Mayo Clinic, Fibromyalgia Diagnosis & Treatment (Sept. 4, 2020), https://www.mayoclinic.org/diseases-conditions/fibromyalgia/diagnosis-treatment/drc-20354785; https://perma.cc/LQG6-B6WH (last visited, October 27, 2025). The ALJ's opinion offers no explanation for why the lapses in rheumatological treatment and the fact of being temporarily off medication indicate a resolution of symptoms, particularly in the face of contrary testimony from two witnesses and medical records indicating chronic pain for a near decade.

The Commissioner also states that the ALJ evaluated Ms. Hultz's daily activities, which indicated that Ms. Hultz's symptoms were resolved. Indeed, the ALJ noted that Ms. Hultz reported the ability to occasionally shop, clean, cook, shop, take care of her children, and socialize with others throughout the years. Ms. Hultz even told her doctors that she went camping in August 2015, and that she was "very active" with her children, "doing a lot of walking and climbing," JA 952, 955, and that her pain medications

21

"allow[ed] her to function to continue to take care of her children." JA 952. But nowhere does the ALJ explain how these instances of normalcy undermine Ms. Hultz's claim of fibromyalgia pain, which is known to wax and wane. As *Arakas* emphasized, "[b]eing able to live independently and participate in the everyday activities of life empowers people with disabilities and promotes their equal dignity." *Arakas*, 983 F.3d at 101. And claimants cannot be penalized for that. *Id*.

Third, in light of the above, Ms. Hultz's and her grandmother's testimony, along with Ms. Hultz's repeated reports of extreme fatigue and muscle pains to her doctors, are the most prominent evidence of the severity of her fibromyalgia. The ALJ discounted both without adequate explanation. And this Court cannot identify evidence in the record that contradicts Ms. Hultz's testimony about her conditions. Her off-and-on treatment and taking of medications, her occasional ability to engage in daily activity, and even her marked improvement on her other medical issues all remain consistent with debilitating fibromyalgia symptoms.

B.

Ms. Hultz also argues that under the Treating Source rule, the ALJ erred in giving little weight to the opinions of Ms. Hultz's treating physicians, in particular that of Dr. Nasseri.

The Treating Source Rule, 20 CFR § 404.1527(c)(2), applied to all applications for benefits filed prior to March 27, 2017. This rule states:

> If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the

22

other substantial evidence in your case record, we will give it controlling weight.

20 CFR § 404.1527(c)(2). If an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must determine the appropriate weight to be afforded by considering factors such as the length and frequency of the treatment relationship, consistency of the opinion with the record, and the physician's specialization. *Id.* § 404.1517(c)(2)–(6). "While an ALJ is not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating physician, it must nonetheless be apparent from the ALJ's decision that he meaningfully considered each of the factors before deciding how much weight to give the opinion." *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 385 (4th Cir. 2021). Moreover, a "'treating physician's testimony is ignored only if there is persuasive contradictory evidence.'" *Arakas*, 983 F.3d at 107 (quoting *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987)).

Here, the ALJ failed to adhere to the Treating Source rule. On November 22, 2017, after treating Ms. Hultz since December 2015, Dr. Nasseri filled out a form indicating that Ms. Hultz's fibromyalgia limited her activities of daily living, in maintaining social function, and in completing tasks in a timely manner due to deficiency in concentration, persistence, and pace. Nonetheless, because Dr. Nasseri did not specify the degree of limitations on that form and because there was a substantial lapse in Ms. Hultz's treatment with him, the ALJ afforded Dr. Nasseri's opinion little weight.

The ALJ's reasons for dismissing Dr. Nasseri's opinion do not indicate that the ALJ properly weighed each factor under the Treating Source rule. Dr. Nasseri, Ms. Hultz's

23

primary doctor for her fibromyalgia and lupus, had been treating Ms. Hultz since December 2015 and was noting chronic fibromyalgia symptoms. In March 2016, Dr. Nasseri indicated details from which it would be fair to infer some degree of limitations, specifically that her chronic pain and fatigue made "daily activities very difficult" and that she required help from her husband for daily care, such as cleaning bathing, dressing and cooking. Although there may have been gaps in treatment, his opinion from November 2017 remains consistent with the record—specifically, with his own documentation of her waxing and waning symptoms from December 2015 to 2017, the records of Ms. Hultz's pain management doctor, the records of Dr. Talebi who became Ms. Hultz's rheumatologist in 2019, and witness testimony from the hearing.

*Arakas* also guides the issue. In *Arakas*, the Court determined that the ALJ erred in dismissing the treating rheumatologist's opinion under persuasive authority from the Second Circuit. *Arakas*, 983 F.3d at 108. Four factors were relevant: First, that the physician had coordinated the claimant's care for many years, during which the patient underwent numerous examinations and procedures. Second, the fibromyalgia diagnosis was well supported by clinical guidelines. Third, MRIs showed a history of degenerative disc disease. Fourth, the rheumatologist ordered various treatments, including medications, injections, and therapy, and found that they failed to provide significant improvement in the claimant's fibromyalgia. *Id.* For the most part, the same factors apply to the instant case, except that Ms. Hultz was not treated by Dr. Nasseri for the same length of time as the patient in *Arakas* by her rheumatologist (20 years). Otherwise, Ms. Hultz's

24

diagnosis is not disputed, she suffered from degenerative disc disease, and treatments did not consistently improve her symptoms.

In any case, a "'treating physician's testimony is ignored only if there is persuasive contradictory evidence.'" *Arakas*, 983 F.3d at 107 (quoting Coffman, 829 F.2d at 518). Here, for all the reasons stated in the preceding subsection on substantial evidence, there is no persuasive contradictory evidence. It was error to afford Dr. Nasseri's opinion little weight and less weight than that of state agency consultants.

### IV.

This Court has the authority to affirm, modify, or reverse the ALJ's decision "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Awarding benefits without remand is appropriate if the record "clearly establishes the claimant's entitlement to benefits and another ALJ hearing on remand would serve no useful purpose." *Arakas*, 983 F.3d at 111 (collecting cases).

In this case, we find sufficient evidence to warrant reversal. Indeed, because of the subjective nature of fibromyalgia, the chronic and untreatable pain that can render doctors' visits a burden, and modern medicine's inability to document medical markers of the disease, Ms. Hultz likely could not come forward with additional medical evidence for the Court to consider. Nonetheless, the existing evidence shows that her condition is sufficiently severe for a finding of disability.

Ms. Hultz's medical records substantiate that she has been experiencing chronic pain and fatigue for nearly a decade. Despite documentation of treatment and evidence of

25

some effectiveness, Ms. Hultz has testified that she cannot function—cannot even remember to take her medication—without the assistance of her family. She can't regularly cook, clean, do laundry, or take care of her children. She spends four to eight days each month entirely bedridden, and on her good days, she is still exhausted enough that she spends hours in bed. Her testimony is corroborated by that of her grandmother and supported by the opinion of her treating physician.

To be sure, a fibromyalgia diagnosis does not create a presumptive entitlement to disability benefits. But the facts of this case—namely Ms. Hultz's subjective complaints of fibromyalgia symptoms, corroborated by her grandmother's testimony and supported by the medical record as a whole—compel the conclusion that Ms. Hultz is entitled to disability benefits.

Fibromyalgia is not a well-understood illness. It is a condition that disproportionately affects women, whose health issues are historically and woefully understudied, and a condition that leaves no markers on medical tests. What we do know is that it is chronic, untreatable, and painful. We must bear in mind that young patients like Ms. Hultz, who filed for disability benefits in her twenties, do not reasonably seek to be disabled, bedridden, and dependent on government funds for sustenance. And where the medical record does not contradict a patient's reports of debilitating fibromyalgia symptoms, we must treat those reports as true. In doing so, we find that the evidence clearly establishes the claimant's entitlement to benefits and another ALJ hearing on remand would serve no useful purpose.

26

V.

After a careful review of the full record, we hold that the ALJ erred in disregarding the Appellant's subjective evidence about the severity of her fibromyalgia symptoms, in contravention of *Arakas* and against the weight of the substantial evidence. Moreover, the ALJ's decision to give little weight to the opinion of Appellant's treating physician was also in violation of the Treating Source rule. Because the undisputed evidence reflects that Ms. Hultz was legally disabled during the relevant period, we reverse the Commissioner's denial of benefits and remand the case for a calculation of benefits.

*REVERSED AND REMANDED*
*FOR CALCULATION OF BENEFITS*

27

AGEE, Circuit Judge, concurring in part and dissenting in part:

In *Arakas v. Commissioner*, 983 F.3d 83 (4th Cir. 2020), this Court held that "ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia[.]" *Id.* at 97. As the majority correctly notes, the ALJ in this case transgressed that directive on its way to concluding that Hultz was not disabled. And if that's where the majority stopped its analysis, I would have been constrained by *Arakas* to join its decision in full.

But that's not what the majority did. Rather than simply vacate the ALJ's decision and remand for reconsideration of Hultz's claim, it went a step further, opting to outright reverse the ALJ's decision and deem Hultz entitled to disability benefits in the first instance. In doing so, it departed from the process courts typically employ when an ALJ errs. Because I have concerns about this action—and about the ramifications of the *Arakas* decision more generally—I respectfully concur in part and dissent in part.

I.

We may award disability benefits without remand only if the record (1) "clearly establishes the claimant's entitlement to benefits," and (2) "another ALJ hearing on remand would serve no useful purpose." Maj. Op. 25 (quoting *Arakas*, 983 F.3d at 111). The majority acknowledges as much but then only conducts a perfunctory analysis before finding these requirements met. *See id.* at 25–26. Setting aside, for now, the broader issues

28

with that analysis,[1] I also disagree with the majority's bottom-line conclusion. In my view, the record does not clearly establish Hultz's entitlement to benefits and another ALJ hearing on remand *could* serve at least *some* useful purpose. I take these up in turn below.

A.

To "*clearly* establish[] [her] entitlement to benefits," *Arakas*, 983 F.3d at 111 (emphasis added), Hultz needed to unequivocally show that she was "disab[led]," *id.* at 90. Below, I outline the procedure for determining whether an individual is disabled, before explaining why, in view of that procedure, Hultz has not made the requisite showing at this stage.

1.

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). ALJs are tasked with evaluating disability claims by using the "five-step sequential evaluation process" set forth in 20 C.F.R. § 404.1520(a)(4).

At step one, the ALJ must determine whether the claimant has been working. 20 C.F.R. § 404.1520(a)(4)(i). Step two then "asks whether the claimant's medically determinable impairments meet the regulations' severity and duration requirements." *Arakas*, 983 F.3d at 90. "If the claimant has been working, or if the claimant's impairments

---

[1] *See infra* Part II.

do not meet the severity and duration requirements, the ALJ must find [that] the claimant is not disabled." *Id.* Otherwise, the ALJ proceeds to step three: "determining whether any of the claimants' impairments, independently or in combination, meets or equals an impairment listed in the regulations, in terms of severity." *Id.* "If any of the claimant's impairments matches a listed impairment, the claimant is disabled." *Id.*

"If unable to make a conclusive determination at the end of step [three], the ALJ must then assess the claimant's Residual Functional Capacity [(RFC)], which is the most work-related activity the claimant can do despite all of her medically determinable impairments and limitations they cause." *Id.*; 20 C.F.R. § 404.1545(a). To discern the claimant's RFC, the ALJ must identify the claimant's "functional limitations or restrictions" and assess the claimant's "ability to do sustained work-related" activities "on a regular and continuing basis"—i.e., "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The ALJ then "express[es] the claimant's [RFC] in terms of the exertional levels of work: sedentary, light, medium, heavy, and very heavy." *Arakas*, 983 F.3d at 90 (cleaned up).

After the RFC assessment, the ALJ proceeds to step four, which asks whether the claimant can still perform past relevant work despite the identified limitations. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant is capable of doing so, she is not disabled. *Id.* Otherwise, the ALJ proceeds to step five.

At the fifth and final step, the ALJ must determine whether the claimant can perform other work considering her RFC, age, education, and prior work experience. *Id.*

30

§ 404.1520(a)(4)(v). If able to perform other work, the claimant is not disabled. If unable, the claimant is disabled.

"The burden of proof lies with the claimant during the first four steps but shifts to the Commissioner at step [five]." *Arakas*, 983 F.3d at 90.

2.

As reflected by the five-step framework outlined above, the disability inquiry is an involved one. Not only does it involve a thorough recounting of the relevant facts, but it also requires ALJs to correctly apply the law. *See Arakas*, 983 F.3d at 94 ("We uphold a Social Security disability determination if (1) the ALJ applied the correct legal standards and (2) substantial evidence supports the ALJ's factual findings."). It was in attempting to do the latter—i.e., correctly apply the law—that the ALJ here failed to follow *Arakas*.

In short, the ALJ relied, in part, on "objective medical criteria" at "step three of the five-step evaluation framework" in determining "whether [Hultz's] fibromyalgia met a listing such as for inflammatory arthritis." Maj. Op. 17. *Arakas* says that's wrong. *See Arakas*, 983 F.3d at 97. The ALJ then compounded that mistake by discounting Hultz and her grandmother's testimony because "[Hultz's] statements concerning the intensity, persistence, and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record." J.A. 948. Such an approach conflicts with our holding in *Arakas*. *See* 983 F.3d at 97 ("ALJs may not rely on objective medical evidence . . . to discount a claimant's subjective complaints regarding symptoms of fibromyalgia[.]").

31

Given the ALJ's legal error, the question then becomes one of disposition: should we vacate and remand for further proceedings, or reverse and remand solely for the calculation of benefits? The majority opted for the latter option. But in my view, the former is the more prudent course.

To begin, recall that to justify reversal rather than vacatur, a claimant must "*clearly* establish[] [her] entitlement to benefits." *Arakas*, 983 F.3d at 111 (emphasis added). But whether a claimant has made that showing is a far different question than whether the claimant has shown that the ALJ committed a legal error in its analysis. *See id.* That is, the fact that Hultz established legal error on the part of the ALJ does not necessarily mean she is "clearly . . . entitle[d] to benefits." *Id.* Instead, it means only that the ALJ needs to conduct its analysis anew, this time avoiding legal error. *See, e.g.*, *United States v. Schwarzbaum*, 24 F.4th 1355, 1365 (11th Cir. 2022) ("Remand is the appropriate remedy when an administrative agency makes an error of law [because] it affords the agency an opportunity to receive and examine the evidence in light of the correct legal principle." (citation omitted)). We need go no farther than observing that process via vacatur and remand to resolve this case.

Moreover, when ALJs legally err, the standard practice is to vacate their decision and remand for further proceedings. *See NLRB. v. Enter. Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Mach. & Gen. Pipefitters of N.Y. & Vicinity, Loc. Union No. 638,* 429 U.S. 507, 522 n.9 (1977) ("When an administrative agency has made an error of law, the duty of the Court is to correct the error of law committed by that body, and, after doing so to remand the case to the [agency] so as to afford it the opportunity of

32

examining the evidence and finding the facts as required by law." (citation omitted)); *Schwarzbaum*, 24 F.4th at 1365; 4 Soc. Sec. L. & Prac. § 55:77 ("[F]ollowing reversal of a determination by an ALJ or the Commission, a court on remand can order the [Social Security Administration] to provide the relief it denied *only in the unusual* case in which the underlying facts and law are such that the agency has no discretion to act in any manner other than to award or deny benefits[.]" (emphasis added) (collecting cases)).

The reason we typically remand under such circumstances is simple: fact-finding and credibility determinations—two areas in which ALJs enjoy primacy—take center stage in the disability analysis. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) ("In reviewing for substantial evidence, we do not undertake to re-weigh conflicting evidence[ or] make credibility determinations . . . . 'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ).'" (cleaned up)); *Arakas*, 983 F.3d at 95 (observing that we should not substitute our judgment for the ALJ's).

Wading into that fact-intensive arena as an appellate court has significant drawbacks. We're not the ones taking testimony, nor are we able to observe witness behavior and the like. No appellate court can analyze witnesses' demeanors to determine their credibility. *Cf. A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 329 n.9 (4th Cir. 2004) ("The ALJ was in a far superior position to evaluate [] witness testimony than the court below, which relied on a body of completely contrary testimony within the cold record."). These concerns are even more acute in fibromyalgia cases. After all, we've held that subjective allegations are the end-all-be-all for establishing a disability claim based on fibromyalgia.

33

*See Arakas*, 983 F.3d at 97–98. There's no one better situated to receive and parse through that sort of subjective evidence than an ALJ.

Additional prudential concerns also counsel in favor of vacatur and remand, perhaps none more compelling than the principle that "we are a court of review, not first view." *Biggs v. N.C. Dep't of Pub. Safety*, 953 F.3d 236, 243 (4th Cir. 2020). The majority's approach ignores that bedrock principle of appellate review, and instead goes rummaging through the record, picks out various pieces of evidence that support its narrative, and finds that the *only possible conclusion* one could reach on these facts is to deem Hultz disabled. *See* Maj. Op. 18–22, 25–26.

Perhaps a thorough and legally sound analysis of the record will lead to that conclusion. It's also possible that, given the conflicting evidence in the record, the ALJ will reach the same conclusion it did below: that Hultz is not disabled. *Compare, e.g.*, J.A. 799–839 (notes from Dr. Reider notes describing Hultz as having "chronic pain" that was "aching, throbbing, and stabbing"), *and* J.A. 761 (note from Dr. Nasseri indicating that Hultz's chronic pain and fatigue made "daily activities very difficult" and that she required help from her husband for daily care), *with* J.A. 951 (ALJ citing neurology note from Dr. Pavan Sawhney that concluded Hultz "had a component of malingering" with respect to her symptoms), *and* J.A. 953–54 (ALJ outlining records that described Hultz's fibromyalgia and lupus symptoms as stable and/or well-controlled), *and* J.A. 951–57 (ALJ observing that Hultz's overall activity level, as self-reported by Hultz, suggested that her symptoms were not quite as severe as claimed).

34

Either way, we shouldn't be the ones doing that analysis in the first instance; that's the ALJ's job. *See NLRB*, 429 U.S. at 522 n.9; *Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013) ("Just as it is not our province to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the ALJ, it is also not our province . . . to engage in these exercises in the first instance." (cleaned up)). And more to the point, on a record like this, we shouldn't say that Hultz has "*clearly* establish[ed] [her] entitlement to benefits," as is required to justify reversal rather than vacatur. *Arakas*, 983 F.3d at 111. We should instead follow our standard procedure and send this case back to the ALJ to reweigh the conflicting evidence under the proper legal framework. Otherwise, we risk usurping the ALJ's proper and well-established role in this scheme.

## B.

To award benefits without remand, it must also be true that "another ALJ hearing on remand would serve no useful purpose." *Arakas*, 983 F.3d at 111. The majority assumes such is the case because, in its view, Hultz is so clearly entitled to benefits that the ALJ could reach no other conclusion on remand. For the reasons already discussed, I disagree that the answer is so cut and dry. But regardless, at least two "useful purpose[s]" could be served by remanding this case to the ALJ. *Id.*

First, remand would ensure that the ALJ in this case (and ALJs more broadly) understand exactly what *Arakas* requires of them. *Arakas* remains fairly new precedent, and this case suggests that ALJs are still discerning its contours. Giving the ALJ another opportunity to assess the facts of this case under the proper legal framework will help to ensure that the administrative review scheme operates as it should. By contrast, if we

35

continue to take matters like this out of the ALJs hands—as we did in both *Arakas* and *Shelley C. v. Commissioner of Social Security Administration*, 61 F.4th 341, 369 (4th Cir. 2023)[2]—we improperly invade their province. *See Craig*, 76 F.3d at 589.

Second, remand would allow the ALJ to develop a fuller record from which to draw its conclusions. And the ALJ could develop it with an eye toward the sort of subjective evidence that is most relevant to the fibromyalgia analysis. That type of record development would be particularly useful here, given the complexity of Hultz's medical history and her numerous ailments.

In short, remand would facilitate the ALJ's grasp of the directives of *Arakas*, while simultaneously respecting their role in the administrative review scheme. It would also permit the ALJ below to further develop the record and reanalyze the facts relevant to Hultz's claim. The majority nonetheless proceeds directly to reversal. I disagree for the reasons stated and therefore respectfully dissent from that portion of the opinion.

II.

---

[2] In *Shelly C.*, this Court extended *Arakas'* holding to disability claims based on a claimant's chronic depression. *See* 61 F.4th at 361 ("In *Arakas*, we held that ALJs could not rely upon the absence of objective medical evidence to discredit a claimant's subjective complaints regarding symptoms of fibromyalgia *or some other disease that does not produce such evidence*. Today, we hold that depression—particularly chronic depression— is one of those other diseases." (cleaned up)). Then, based on that holding, the Court reversed and remanded the ALJ's decision with instructions to grant disability benefits to Shelley C, just like the majority does for Hultz here.

Setting aside the narrower issues with reversing and remanding in *this* case, I also write to express a broader concern with our fibromyalgia-related jurisprudence.

As noted above, we issued a sweeping holding in *Arakas*: "ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence." 983 F.3d at 97. We further held that if such objective evidence is "considered at all, [it]—along with consistent trigger-point findings—should be treated as evidence *substantiating* the claimant's impairment." *Id.* at 97–98.

This approach is, to some extent, consistent with those employed by our sister circuits. *See, e.g.*, *Revels v. Berryhill*, 874 F.3d 648, 665–66 (9th Cir. 2017) (critiquing an ALJ decision that relied on objective evidence to deny a claimant's fibromyalgia-based claim); *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) ("It also appears to us that the ALJ . . . misunderstood [fibromyalgia's] nature. The ALJ effectively required 'objective' evidence for a disease that eludes such measurement. . . . Moreover, a growing number of courts, including our own, have recognized that fibromyalgia is a disabling impairment and that there are no objective tests which can conclusively confirm the disease." (cleaned up)); *cf. Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) ("[G]iven the nature of fibromyalgia, where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important. . . . [T]he nature of fibromyalgia itself renders [] a brief analysis and over-emphasis on objective findings

37

inappropriate."); *Sarchet v. Chater*, 78 F.3d 305, 307–09 (7th Cir. 1996) (vacating and remanding ALJ decision in part because it was based on a "pervasive misunderstanding of [fibromyalgia]"); *Brosnahan v. Barnhart*, 336 F.3d 671, 677–78 (8th Cir. 2003) (noting that "fibromyalgia can be disabling," and critiquing ALJ's decision for "discredit[ing] [the] claimant because her subjective complaints [we]re not fully supported by objective medical evidence").

However, in *Arakas*, we went a step further than most other courts by reversing and remanding solely for a calculation of disability benefits, rather than vacating and remanding for the ALJ to reconsider the facts under a proper legal standard. *Compare Arakas*, 983 F. 3d at 111–12, *with Rogers*, 486 F.3d at 250 (vacating and remanding ALJ decision for further fact-finding and analysis), *and Sarchet*, 78 F.3d at 309 (same), *and Brosnahan*, 336 F.3d at 678 (same). While we have the authority to issue such a disposition, *see* 42 U.S.C. § 405(g), it should be done with caution, *see supra* Part I.A.2; Part I.B.

Making matters worse, the majority here primarily hinges its decision to reverse and remand for calculation of benefits on the following considerations: "the subjective nature of fibromyalgia, the chronic and untreatable pain that can render doctors' visits a burden, and modern medicine's inability to document medical markers of the disease." Maj. Op. 25; *see id.* at 25–26 (outlining certain of Hultz's subjective complaints and testimony). But these observations are broad enough to encompass nearly *all* fibromyalgia diagnoses—not just Hultz's. After this case, absent unmistakable fraud, I find it difficult to project *any* fibromyalgia claimant who could be denied disability benefits. Such a result is not reflective of Congress' intent in writing the Social Security Act.

38

No doubt, fibromyalgia is a unique disease that may be disabling to certain individuals. *See Arakas*, 983 F.3d at 96–97. But that will not always be the case. *See Sarchet*, 78 F.3d at 307 ("Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not and the question is whether [the claimant] is one of the minority." (internal citations omitted)); Soc. Sec. Disability L. & Proc. in Fed. Ct. § 5:72 ("While fibromyalgia is often quite painful, the diagnosis of fibromyalgia alone does not ensure a finding of disability. . . . Some courts have upheld the denial of disability benefits where the ALJ determined that the claimant's fibromyalgia was either improving or, at worst, remaining stable." (collecting cases)).

Determining whether a claimant's fibromyalgia is truly disabling requires a fact-intensive inquiry that is best-suited for an ALJ to tackle in the first instance. *See Radford*, 734 F.3d at 296 (emphasizing that it is the ALJ's province—not ours—to "[]weigh conflicting evidence, [and] make credibility determinations"); Soc. Sec. Disability L. & Proc. in Fed. Ct. § 5:72 (noting that ALJs must make findings "as to the severity of [a claimant's fibromyalgia] symptoms and limitations"). We should not avoid this process for the sake of reaching a particular outcome sooner. By doing so, we imperil the proper functioning of this entire administrative review scheme.

\*   \*   \*

In short, the majority fails to adequately justify its decision to reverse and remand this matter solely for a calculation of benefits. Its failure in this regard is twofold: (1) it's not obvious that Hultz has "clearly established her entitlement to benefits," and (2) useful purposes could be served by remand rather than reversal. Moreover, the majority's decision

39

has no limiting principle. That is, following the majority's view, it's hard to envision a record that *wouldn't* support a disability finding for a fibromyalgia claimant. We should not go down that road.

III.

For the reasons discussed above, I respectfully concur in part and dissent in part. Specifically, I concur in the judgment that the ALJ erred by failing to adhere to the *Arakas* decision. But I would go no farther, leaving it to the ALJ on remand to redevelop and then consider the factual record in view of the proper legal standards. Therefore, I respectfully dissent from that part of the opinion.